901 N.E.2d 1006 (2009)
Patricia LARD, Special Administrator of the Estate of Charles Lard, Deceased, et al., Plaintiffs,
v.
AM/FM OHIO, INC., and Clear Channel Broadcasting, Inc., Defendants-Appellants.
(Heroes Sports Bar and Grill, d/b/a The Epitome, f/k/a LaMirage All Night Studio, Ltd., n/k/a The Clique; Dwain Kyles; Calvin Hollins; Lesly Benodin; and Lesly Motors, Inc.; Defendants-Appellees;
Envy Productions and Entertainment Co., Inc., a/k/a Envy Productions; Marco Flores; Team One Security; Onesti Entertainment Corp.; Raphael Dellot; The City of Chicago; Vaughn Woods; and Ira Navarro; Defendants).
Nos. 1-06-3336, 1-07-1450.
Appellate Court of Illinois, First District, Fifth Division.
January 16, 2009.
*1010 Michael D. Freeborn, Catherine A. Miller and Tonita M. Helton, Freeborn & Peters LLP, Chicago, IL, for Defendants-Appellants.
Esther Joy Schwartz and David S. Allen, Stellato & Schwartz, Ltd., and Swanson, Martin & Bell, LLP (of counsel John A. Terselic), Chicago, IL, for Defendants-Appellees.

MODIFIED UPON DENIAL OF PETITION FOR REHEARING
Justice O'MARA FROSSARD delivered the opinion of the court:
Over the objection of defendants-appellants AM/FM Ohio, Inc., and Clear Channel Broadcasting, Inc. (collectively, Clear Channel), the trial court ruled that the settlement agreements entered into between the plaintiffs and certain defendants were made in good faith within the meaning of the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 et seq. (West 2006)). The settling defendants-appellees are Dwain Kyles, Calvin Hollins, Lesly Benodin, Lesly Motors, Inc., and Heroes Sports Bar & Grill, d/b/a The Epitome, f/k/a LaMirage All Night Studio, Ltd., n/k/a The Clique (Epitome) (collectively, the settling defendants). The trial court's rulings extinguished Clear Channel's contribution claims against the settling defendants in an action involving 22 wrongful death claims and more than 70 remaining personal injury claims.
Clear Channel appeals, arguing that the trial court misapplied the law by not requiring the settling defendants to obtain releases or covenants from the plaintiffs and allocate the settlement proceeds among the plaintiffs. Clear Channel also contends the trial court's good-faith finding was an abuse of discretion. Specifically, Clear Channel complains that the settlement amounts were disproportionate to the settling defendants' culpability, discovery concerning the settling defendants' culpability was not allowed, and there was circumstantial evidence of collusion and wrongful conduct.
For the reasons that follow, we affirm the judgment of the trial court.

BACKGROUND
On February 17, 2003, security personnel attempted to quell a disturbance by spraying mace or pepper spray in the overcrowded E2 nightclub, which was located on the second floor above the Epitome restaurant at 2347 South Michigan Avenue in Chicago. When patrons attempted to flee the nightclub, a pileup resulted in the stairwell. Numerous patrons were injured and 21 were killed.
*1011 Various plaintiffs filed wrongful death claims and personal injury actions against multiple defendants, including Epitome, its owner Kyles, and its manager Hollins; the building owner Lesly Motors, Inc. (Lesley Motors), and its president and sole shareholder Lesly Benodin; Clear Channel, the owner of a radio station that had aired promotions of Epitome's events; disc jockey Vaughan Woods; dance party promoters Marco Flores and Envy Productions & Entertainment Co., Inc.; Team One Security and its owners Raphael Pellot and Ira Navarro; Onesti Entertainment Corp.; and the City of Chicago (City).
Eventually, the trial court consolidated those lawsuits and approved the plaintiffs' two master complaints for bodily injury and wrongful death (master complaints litigation). Generally, plaintiffs alleged that defendants locked, obstructed and blocked exit doors; failed to provide adequate security; failed to provide adequate and accessible exits; allowed an excessive number of people to enter the nightclub, which was structurally unsafe, unsound and posed a hazard; and allowed the nightclub to operate in violation of the City building code. Later, the consolidated lawsuits were amended to add a count against Epitome under the Illinois Dramshop Act (235 ILCS 5/6-21 (West 2002)), alleging that it served alcoholic liquor to patrons, causing their intoxication and involvement in the disturbance that prompted the security guards to use mace or pepper spray.
All defendants either filed counterclaims or cross-claims for contribution against one another, or were deemed to have filed such claims pursuant to the trial court's order dated February 17, 2005.
Meanwhile, the Cook County State's Attorney indicted Kyles, Hollins, Flores, and another individual in September 2003 for involuntary manslaughter arising from the nightclub incident. In anticipation that other defendants in the master complaints litigation would be indicted, the trial court in the master complaints litigation stayed discovery directed at Kyles, Hollins, Flores and Benodin to protect their fifth amendment rights against self-incrimination.
Discovery established that, in 1976, Benodin incorporated Lesly Motors, which operated as an auto dealership until about 1999. Lesly Motors owned and leased the building in question to Kyles, Hollins, and their corporations, who operated the restaurant and nightclub. A written lease was executed in 1987 between Lesly Motors as the lessor and Kyles, Hollins, and their corporations as the lessees. They executed a second lease in 1989 for a 10-year period. In 1999, the lease was extended again for a 10-year term, and it was in effect at the time of the February 2003 incident.
The 1999 lease listed Benodin, under his home address, as the lessor and Hollins and his corporation LaMirage, d/b/a The Clique, as the lessees. According to the lease, the lessees were obligated to maintain the premises and ensure that the premises complied with all laws, rules, regulations and codes. The lessor had no obligation to make repairs. The lessor had limited rights to enter the property after giving proper notice. For example, the lessor could enter to show the property to prospective purchasers and to ascertain the condition of the premises and whether the lessees were performing their obligations under the lease. The lessor could enter the premises to make any repairs the lessees failed to make, but only after the lessees failed to cure the default after 10 days' notice. The lessor also had the right to enter the premises without notice in case of an emergency.
The lessees made their rent checks payable to Lesly Motors, and those checks *1012 were deposited into Lesly Motors' bank account. Lesly Motors paid the real estate taxes for the property. In 2001, Lesly Motors and the lessees entered a written agreement to resolve a rent dispute. That agreement identified Lesly Motors as the landlord under the 1999 lease for the property.
In 2002, the City filed a complaint in the circuit court of Cook County alleging code violations related to the building. The complaint was filed against all defendants that owned, maintained, operated, collected rents for, or had an interest in the building. The City served its complaint on Lesley Motors by serving Benodin at his residence. Lesly Motors appeared in the case, and LaMirage was impleaded later as a defendant. The City did not sue Benodin in any individual capacity. On July 19, 2002, the court ordered that the second floor of the building could not be occupied.
In October 2002, Lesly Motors and Epitome entered a purchase and sale agreement for the property, which acknowledged the City's pending building code violation lawsuit. Epitome agreed that after the sale was consummated, Epitome would be substituted for Lesly Motors as the sole defendant in the lawsuit, would pay and be solely responsible for any damages, court costs, fines and penalties related to the lawsuit, and would hold Lesly Motors free and harmless therefrom.
In April 2003, Lesly Motors filed its answer and affirmative defenses in the building code litigation. Lesly Motors admitted that it owned the building but had leased the property and did not maintain the property or operate the business on the premises. Lesly Motors asserted that it could not remedy the code violations during the period that LaMirage was in possession of the property. Furthermore, Lesly Motors asserted that after LaMirage failed to remedy the code violations, Lesly Motors attempted to comply with the code. Specifically, On January 29, 2003, Benodin, as the president of Lesly Motors, and a civil engineer secured access to the building's second floor. Furthermore, Lesly Motors paid the outstanding balance owed to LaMirage's structural engineer and employed him to complete his engineering studies with the assistance of Lesly Motors' civil engineer. The structural engineer's remediation plans, which were delivered to Lesly Motors on February 24, 2003, indicated that the work would take about six weeks to complete once the City issued permits.
While the master complaints litigation was pending, defendants Epitome, Kyles and Hollins filed for bankruptcy. The bankruptcy court modified the automatic stay in their cases to permit plaintiffs to continue their litigation against Epitome, Kyles and Hollins in order to determine their liability and secure a judgment that would be collectible only to the extent of those defendants' insurance coverage. In 2005, the bankruptcy court discharged all claims against Kyles and Hollins. In 2006, the bankruptcy trustee found that Epitome had no assets.
At the time of the February 2003 E2 nightclub incident, Illinois Casualty Company (ICC) had issued Epitome a business owner's policy and a liquor liability policy, each with a $1 million liability limit. Kyles, Hollins and Benodin all claimed coverage under the ICC policies for the master complaints litigation. ICC defended Epitome, Kyles, Hollins, and Benodin under a reservation of rights and also filed a declaratory judgment action against them and others, denying coverage based upon allegations of fraud in the application for the policies. Specifically, ICC claimed the defendants' stated business purpose was to use the second floor as a banquet hall, not as an area to hold dance events *1013 and sell and serve alcohol. ICC also sought a declaratory judgment finding no coverage under the liquor liability policy for the dramshop claims.
Furthermore, State Farm Insurance (State Farm) had issued Benodin a homeowner's policy with a $2 million limit and a personal umbrella policy with a $1 million limit. When Benodin tendered this Epitome litigation to State Farm for coverage, State Farm denied the tender. In addition, Capital Insurance Company (CIC) had issued Lesly Motors a liability insurance policy with a $1 million limit.
In February 2006, plaintiffs agreed to settle their claims against Epitome, Kyles, Hollins, and Benodin for $1.5 million, which would be funded by the ICC $1 million business owner's policy and half of the $1 million liquor liability policy. The other half of the $1 million liquor liability policy was being used to settle the dramshop claims. In addition, Benodin would assign his rights in his personal State Farm $2 million insurance policies, despite coverage being denied for this loss. Moreover, Benodin would make a separate assignment, individually, as a putative insured separate and apart from the liability policy covering Lesly Motors.
The settlement provided that all the insurance proceeds from Epitome, Kyles, Hollins, and Benodin  and any future settlements from other defendants  would be paid to a qualified settlement fund (QSF), established under section 468B of the Internal Revenue Code (26 U.S.C. § 468 (2000)), without any restrictions as to how that sum would be allocated among the plaintiffs. The independent QSF administrator would negotiate with the plaintiffs at a future date to allocate the funds among them without the involvement of defendants Epitome, Kyles, Hollins or Benodin. Those defendants' payment to the QSF was contingent upon the trial court's good-faith finding and dismissal of the counterclaims becoming no longer subject to appellate review. Those defendants would make the payment for a full global release and dismissal with prejudice of all direct and contribution claims without the need for any individual plaintiff to execute a release until the QSF administrator ultimately distributed the settlement proceeds. The settlement would preserve the nonsettling defendants' arguments regarding the settlement division and future setoffs. A proposed settlement order, which memorialized all the settlement terms and conditions, was submitted to the trial court and counsel for all parties for their review, objections, modifications or revisions.
In support of their petition for a good-faith finding, defendants Epitome, Kyles, Hollins and Benodin stated that, regarding the payment of the full $1 million policy limit of the business owner's policy, ICC was defending them under a reservation of rights and litigating the coverage issue, which could remove those funds from the settlement mix. Furthermore, there was no further insurance coverage available to Epitome, Kyles and Hollins, and their bankruptcies limited the plaintiffs' potential recovery to those defendants' insurance coverage.
Epitome, Kyles, Hollins and Benodin also stated that, regarding the payment of half the available limit of the liquor liability policy, the plaintiffs could not factually establish the dramshop claims, any dramshop recovery was limited under the statute, and not all plaintiffs eligible to participate in the QSF had filed timely dramshop claims. In addition, Illinois does not recognize contribution by or against a defendant sued under the dramshop statute because that liability was based on the statute rather than a theory of negligence.
*1014 Only defendant Clear Channel objected to the petition for a good-faith finding, asserting that Benodin was too wealthy to be extricated from the lawsuits merely for insurance policy limits. In response, Benodin's counsel argued that, despite the fact that Benodin signed the 1999 lease, which listed him in his individual capacity as the lessor, the true ownership of the property had always been Lesly Motors. Moreover, Benodin had prepared and signed that 1999 lease without the aid of counsel for the sake of expediency.
The trial court ordered that Benodin's deposition be taken under court supervision. The trial court limited discovery to the issues of the nature and extent, if any, of Benodin's personal involvement, role or participation in the operation of Epitome and any actions or omissions that gave rise to the February 2003 incident. Any discovery concerning the identification of Benodin's personal assets was held in abeyance until such time as those assets became relevant.
At his deposition in July 2006, Benodin testified that when he prepared the 1999 lease that identified himself  as opposed to Lesly Motors  as the lessor, he had copied a lease without identifying Lesly Motors' involvement as the property owner or himself as the company's president. Lesly Motors' sole business interest in the operations of the nightclub was as a landlord receiving rent. Lesly Motors wholly leased the premises to the tenants and did not occupy any part of the building. Benodin stated that he was not involved in determining security at the E2 nightclub or the decision to allow patrons to enter the nightclub on the evening in question or at any time. He did not formulate business policies, focus or strategies. He did not block, lock or in any way obstruct the club's exits and had no knowledge of that at any time. Benodin asserted that Lesly Motors complied with the court's order not to occupy the second floor of the nightclub, and he understood that the tenants were working with the City to remedy the code violations.
On October 25, 2006, after hearing arguments, the trial court granted the motion of defendants Epitome, Kyles, Hollins and Benodin for a good-faith finding under the Contribution Act. Those defendants and all contribution claims against them were dismissed from the lawsuit. The trial court determined that, under the totality of the circumstances, the $1.5 million settlement represented "the best amount available under extraordinarily poor circumstances." The trial court noted that Epitome, Kyles and Hollins bore a "large degree of legal liability"; nevertheless, their financial circumstances made the probability of recovery against them "slim at best" and their insurance was "virtually all that [was] available" after their bankruptcies. Furthermore, there was no evidence to substantiate plaintiffs' dramshop claims, and the fact that half of the liquor liability policy was tendered was "an exceptionally positive circumstance." In addition, the evidence established that Benodin was not subject to individual liability and was not acting in any capacity other than as an officer of Lesly Motors. Moreover, under the lease terms, lessor Lesly Motors had no duty to make repairs or do work to comply with the laws and ordinances regarding the use and occupancy of the premises.
The court found unpersuasive Clear Channel's argument that there could be mischief regarding future setoff problems. Specifically, the court noted that Clear Channel had not been found liable yet for damages and was free to present all its defenses at trial. Moreover, the court stated that the trier of fact would be capable of apportioning fault for the "empty-chair" *1015 defendants, who would be included on any verdict form. The court found that Clear Channel presented no concrete evidence to challenge the good faith of the settlement and, thus, failed to satisfy its burden of demonstrating that the settlement was not made in good faith.
Thereafter, plaintiffs agreed to settle their claims against Lesly Motors for $1 million, the limits of Lesly Motors' insurance policy with CIC. In January 2007, Lesly Motors filed its petition for a good-faith finding under the Contribution Act. The petition included a proposed settlement order and release for the trial court's signature. The proposed order set forth the parties to the settlement, the terms of the settlement, the amount to be paid into the QSF, the release that would be given by every plaintiff or lienholder to Lesly Motors in exchange for the payment, and the condition that the plaintiffs' claims and the counterclaims against Lesly Motors would be dismissed. The proposed order stated that it served in lieu of individual releases from every plaintiff. No allocation of the proceeds was made.
Clear Channel opposed the motion, for the same reasons presented in conjunction with the prior motion for a good-faith finding.
On May 24, 2007, the trial court granted Lesly Motors' motion for a good-faith finding and dismissed Lesly Motors and all contribution claims against it. The trial court determined that Lesly Motors made its preliminary showing of good faith, considering the available limits of insurance, the theories of liability pled, and the likelihood of success of those claims. The trial court also found that Clear Channel submitted no evidence to meet its burden to show that the settlement was the result of fraud, collusion or any wrongful conduct.
Clear Channel appealed.

ANALYSIS

I. Requirements Under the Contribution Act
Clear Channel contends the trial court's good-faith determination violates the plain language of the Contribution Act because (1) the settling defendants did not obtain releases or covenants not to sue from the individual plaintiffs, and (2) the settlement proceeds were not allocated among the individual plaintiffs and their various claims.
Statutory interpretation presents a question of law that we review de novo. Quad Cities Open, Inc. v. City of Silvis, 208 Ill.2d 498, 508, 281 Ill.Dec. 534, 804 N.E.2d 499 (2004). When construing a statute, a court should look to the plain language of the statute to ascertain and give effect to the intent of the legislature. Bonaguro v. County Officers Electoral Board, 158 Ill.2d 391, 397, 199 Ill.Dec. 659, 634 N.E.2d 712 (1994). We must read the statute in the manner in which it was written and must not read into it exceptions, limitations or conditions that are not already there. Ultsch v. Illinois Municipal Retirement Fund, 226 Ill.2d 169, 190, 314 Ill.Dec. 91, 874 N.E.2d 1 (2007); Rosewood Care Center, Inc. v. Caterpillar, Inc., 226 Ill.2d 559, 567, 315 Ill.Dec. 762, 877 N.E.2d 1091 (2007).
The Contribution Act provides that where two or more persons are subject to tort liability to the same person for the same injury, there is a right of contribution among them. Henry v. St. John's Hospital, 138 Ill.2d 533, 539, 150 Ill.Dec. 523, 563 N.E.2d 410 (1990); 740 ILCS 100/2(a) (West 2006). "This right of contribution exists only in favor of tortfeasors who have paid more than their pro rata share of the common liability, and recovery is limited to the amount they have paid in *1016 excess of their pro rata share." Henry, 138 Ill.2d at 539, 150 Ill.Dec. 523, 563 N.E.2d 410, 740 ILCS 100/2(b) (West 2006). In order to obtain a discharge from all liability for any contribution to any other tortfeasor, a release or covenant not to sue or not to enforce judgment must be given by the plaintiffs in good faith and state the amount paid for the release or covenant. 740 ILCS 100/2(c), (d) (West 2006). The release or covenant does not discharge any of the other nonsettling tortfeasors from liability for injury unless the terms of the release or covenant so provide. 740 ILCS 100/2(c) (West 2006). However, the recovery on any claim against the nonsettling tortfeasors is reduced to the extent of any amount stated in the release or covenant, or in the amount paid for it, whichever is greater. 740 ILCS 100/2(c) (West 2006).
The Contribution Act does not define the term good faith, but our supreme court has explained that a trial court should consider the totality of the circumstances surrounding the settlement to make this determination. In re Guardianship of Babb, 162 Ill.2d 153, 162, 205 Ill.Dec. 78, 642 N.E.2d 1195 (1994). This standard enables the trial court to strike a balance between the public policy favoring the peaceful settlement of claims and the policy favoring the equitable apportionment of damages among tortfeasors. Associated Aviation Underwriters, Inc. v. Aon Corp., 344 Ill.App.3d 163, 175, 279 Ill.Dec. 356, 800 N.E.2d 424 (2003). A settlement will not be found to have been made in good faith where there has been collusion, unfair dealing, or wrongful conduct by the settling parties. Babb, 162 Ill.2d at 162, 205 Ill.Dec. 78, 642 N.E.2d 1195. In addition, a settlement agreement that conflicts with the terms of the Contribution Act or is not consistent with its underlying policies cannot satisfy the good-faith requirement and cannot thereby discharge the settling tortfeasor from contribution liability. Dubina v. Mesirow Realty Development, Inc., 197 Ill.2d 185, 192, 258 Ill.Dec. 562, 756 N.E.2d 836 (2001).

A. Release
Clear Channel complains that the settling defendants glossed over the release requirement by having the court orders dated October 25, 2006, and May 24, 2007, serve as the releases in lieu of individual releases from each plaintiff. Clear Channel, however, cites no relevant authority to support its assertion that the Contribution Act required individual releases from each plaintiff in a mass tort situation.
The Contribution Act does not set forth a specific form that a release must take and does not even require the release to be in writing. Stacy v. Ametek, Inc., 205 Ill.App.3d 58, 61, 150 Ill.Dec. 377, 562 N.E.2d 1180 (1990) ("it is the existence of a settlement agreement that is important here, not the execution of a written release"). Plaintiffs' acceptance of the settlement agreement amounted to an implied release and would be an affirmative defense in any action to impose additional liability upon the settling defendants. The terms of the orders submitted by the plaintiffs and settling defendants and signed by the trial court on October 25, 2006, and May 24, 2007, were negotiated by the settling parties and entered into voluntarily. Those orders memorialized the parties' settlement agreement, dismissed the wrongful death and personal injury cases against the settling defendants, and released them from those claims for $2.5 million. Those orders stated that they served in lieu of any written, executed release documents in favor of the settling defendants and were binding on behalf of all the plaintiffs.
*1017 Specifically, the orders provided that Epitome, Kyles, Hollins and Benodin would pay $1.5 million and Lesly Motors would pay $1 million to the QSF; every complaint filed against the settling defendants would be dismissed; and the settling defendants would be released from all claims or actions of any kind arising out of the February 2003 incident in exchange for the $2.5 million payment. The orders described with specificity the parties to the agreements, the amounts and sources of the payments to the QSF, the dismissal of the claims and counterclaims, the claims released, and that the court would retain jurisdiction over the payment and later allocation of the settlement. There were no additional, undisclosed terms or conditions to the settlement agreements, and every party, including the nonsettling defendants, received copies of the proposed agreement and release so they had notice and an opportunity to object.
Rather than collecting and submitting over 90 individual identical releases, the settling parties sought the convenience of just two release and dismissal orders. We find no prohibition under the Contribution Act against memorializing a settlement and release agreement in the manner chosen by the settling parties here.

B. Allocation
Clear Channel also complains that the good-faith finding was premature without an allocation of the settlement proceeds among the individual plaintiffs. Although the express language of the statute does not state that an allocation must precede a good-faith finding, Clear Channel contends that requirement is presumed because no plaintiff should release his claim without knowing specifically what he receives in exchange and the issue of the equitable apportionment of the settlement is central to a trial court's good-faith determination. Clear Channel asserts that an allocation of the settlement proceeds must be made among the plaintiffs before the trial court's good-faith determination in order to permit a nonsettling defendant to use the settlement as a setoff against any future damage award. Clear Channel warns that the failure to allocate invites inequitable apportionment among the plaintiffs and manipulation of future setoffs. Clear Channel argues, for example, that plaintiffs could enhance their recovery from the remaining solvent defendants by allocating more settlement funds to plaintiffs with weaker cases, which are then dismissed while plaintiffs with stronger cases proceed to trial.
We agree with Clear Channel that a specific allocation among plaintiffs and their claims before a good-faith determination is generally the normal course for parties seeking a discharge from liability under the Contribution Act. This case, however, presents unusual obstacles because it involves mass tort litigation and the most culpable defendants have been discharged in bankruptcy. Moreover, any recovery from them is limited to their insurance policies, and that insurance coverage is being contested due to allegations of fraud in the application for the policies. Due to the difficult and unique circumstances present in this case, the settling parties submitted, and the trial court granted, a petition for a good-faith finding that structured the settlement to enable the insurance companies to deposit the policy limits into a QSF for future allocation among about 90 plaintiffs by an independent administrator, subject to the trial court's retained jurisdiction and approval. Moreover, the settlement preserves the nonsettling defendant's objections to the future allocation for purposes of double recovery or setoff. The settlement comports with the plain language of the Contribution Act because the terms provide *1018 that all the plaintiffs are releasing their claims against the settling defendants for $2.5 million. Clear Channel's argument on appeal is not persuasive because it lumps together the setoff issue, wherein Clear Channel generally has a burden of proof, with the issue of allocation, wherein Clear Channel is not permitted a participatory role.
Section 2(c) of the Contribution Act provides that a good-faith settlement reduces the recovery on any claim against a nonsettling tortfeasor to the extent of the amount stated in the release or actually paid for it. 740 ILCS 100/2(c) (West 2006). This provision reflects the long-recognized principle in Illinois that a plaintiff shall have only one satisfaction for an injury. Pasquale v. Speed Products Engineering, 166 Ill.2d 337, 368, 211 Ill. Dec. 314, 654 N.E.2d 1365 (1995). This provision condemns and seeks to prevent a double recovery. Pasquale, 166 Ill.2d at 368, 211 Ill.Dec. 314, 654 N.E.2d 1365. The provision also reflects the public policy of protecting the financial interests of the nonsettling parties in a settlement, so allowing setoff ensures that a nonsettling party will not be required to pay more than its pro rata share of the shared liability. Pasquale, 166 Ill.2d at 368, 211 Ill. Dec. 314, 654 N.E.2d 1365.
A nonsettling defendant may claim as a setoff any amount that the plaintiff recovered in a prior settlement with settling defendants, but the only amounts that may normally be applied are those which compensated for the same injury or wrongful death for which the nonsettling defendant was ultimately found liable. Pasquale, 166 Ill.2d at 368-69, 211 Ill.Dec. 314, 654 N.E.2d 1365. "The determination as to which of several claims a settlement award should be attributed to is considered a matter within the trial court's discretion." Pasquale, 166 Ill.2d at 369, 211 Ill.Dec. 314, 654 N.E.2d 1365. "Generally, the party seeking the setoff bears the burden of proving what portion of a prior settlement was allocated or is attributable to the claim for which he is liable." Pasquale, 166 Ill.2d at 369, 211 Ill.Dec. 314, 654 N.E.2d 1365. However, our supreme court has found that where a plaintiff recovers for several injuries in a lawsuit and fails to apportion damages accordingly, a nonsettling defendant may be relieved of that burden of proof. Pasquale, 166 Ill.2d at 369, 211 Ill.Dec. 314, 654 N.E.2d 1365; Patton v. Carbondale Clinic, S.C., 161 Ill.2d 357, 370, 204 Ill.Dec. 203, 641 N.E.2d 427 (1994) (where the plaintiffs did not allocate the settlement, the nonsettling defendants were entitled to setoff the entire amount of the prior settlements).
As discussed above, the settlement agreement preserves Clear Channel's arguments concerning setoff, thereby guarding against any double recovery by plaintiffs. Nevertheless, Clear Channel complains that plaintiffs should not be able to enhance their overall recovery by allocating settlement proceeds to plaintiffs with weaker cases or minor injuries while the plaintiffs who have stronger cases and major injuries proceed to trial. Clear Channel complains that such "manipulation" would unfairly reduce its ultimate setoff.
Although the manipulation of an allocation can be evidence of bad faith in a settlement negotiation, it is not per se bad faith to engage in the advantageous apportioning of a settlement. Readel v. Towne, 302 Ill.App.3d 714, 718, 235 Ill.Dec. 839, 706 N.E.2d 99 (1999). This court has recognized the importance of allowing the settling parties to apportion their settlements to their advantage. Specifically, in Muro v. Abel Freight Lines, Inc., 283 Ill.App.3d 416, 218 Ill.Dec. 691, 669 N.E.2d 1217 (1996), we stated:

*1019 "A plaintiff who enters into a settlement with a defendant gains a position of control and acquires leverage in relation to a nonsettling defendant. This posture is reflected in the plaintiff's ability to apportion the settlement proceeds in the manner most advantageous to it. Settlements are not designed to benefit nonsettling third parties. They are instead created by the settling parties in the interests of these parties. If the position of a nonsettling defendant is worsened by the terms of a settlement, this is the consequence of a refusal to settle.
* * * A defendant who fails to bargain is not rewarded with the privilege of fashioning and ultimately extracting a benefit from the decisions of those who do." Muro, 283 Ill.App.3d at 420, 218 Ill.Dec. 691, 669 N.E.2d 1217.
In their petitions for good-faith findings, the plaintiffs and settling defendants represented that the $2.5 million settlement would be divided up at a later date between the plaintiffs among the wrongful death and personal injury claims, and that the nonsettling defendants' arguments concerning the future settlement division and setoffs would be preserved. The settling parties requested and the trial court approved the creation of a QSF within the meaning of section 468B of the Internal Revenue Code and the Treasury regulations thereunder. A QSF is a fund, account or trust set up pursuant to a statute or court order and subject to the continuing jurisdiction of that governmental authority. A QSF is established to resolve or satisfy contested or uncontested claims arising out of a tort, among other specified bases of liability, and is treated as a trust where the transferor's assets are segregated from other assets. 26 U.S.C. § 468B (2000).
According to the terms of the settlement, a trust company would hold the settlement funds under the trial court's order establishing the QSF and serve as the independent fund administrator. Upon payment to the QSF by the settling defendants, such payment would resolve and satisfy all present and future claims against the settling defendants arising out of the E2 nightclub incident. The plaintiffs would allocate the settlement proceeds among themselves without involving the settling defendants, and the fund administrator would submit to the trial court the plaintiffs' agreement for proposed allocation as soon as practical after the entry of the trial court's order. The fund administrator was authorized to settle all claims if the plaintiffs were unable to agree among themselves about the allocation of shares from the QSF. The trial court retained the authority to approve the reasonableness of the future allocation and distribution among the plaintiffs.
This settlement does not permit the settling parties to allocate the payment to deprive the nonsettling defendants of their statutory right to a setoff. The form of the settlement is consistent with the requirements of the Contribution Act and its policies to promote settlements with a fair apportionment of damages among tortfeasors. 740 ILCS 100/2(c), (d) (West 2006). The settling defendants were encouraged to settle in order to extinguish their potential liability to the plaintiffs and joint tortfeasors. Further, by paying the insurance policy limits into the QSF, those funds will be available as a setoff to Clear Channel, and the trial court's orders preserve all setoff issues for future decision without any input or influence by the settling defendants.
Clear Channel cites Muro, 283 Ill. App.3d at 417-18, 218 Ill.Dec. 691, 669 N.E.2d 1217, for the proposition that a *1020 trial court's good-faith finding was premature and erroneous where the settling parties did not provide the court with any information as to how the proceeds of the $75,000 settlement at issue were allocated among the plaintiff's wrongful death, survival action and family expense claims. Muro, however, is distinguishable on its facts. There, the trial court entered a good-faith finding without an evidentiary hearing and later apportioned the settlement proceeds according to the nonsettling defendant's proposed allocation and over the plaintiff's objection. Muro, 283 Ill. App.3d at 418-19, 218 Ill.Dec. 691, 669 N.E.2d 1217. The appellate court reversed and remanded for an evidentiary hearing to evaluate the settlement and the method of apportionment, emphasizing that the nonsettling defendant was not allowed to participate in the allocation negotiations between the plaintiff and the settling defendant. Muro, 283 Ill.App.3d at 419-20, 218 Ill.Dec. 691, 669 N.E.2d 1217. Such participation by nonsettling defendants would grant them veto power over any decision adverse to them and would thwart the goal of encouraging settlements. Muro, 283 Ill.App.3d at 420, 218 Ill.Dec. 691, 669 N.E.2d 1217.
Here, in contrast, the case involves mass tort litigation, and the trial court conducted a hearing before making the good-faith determination. The record establishes that the trial court evaluated the settlement and reserved approval of the reasonableness of the future allocation of the proceeds from the QSF among the plaintiffs. Moreover, Clear Channel has not been found liable for damages yet and is free to present all its defenses at trial.
We also find misplaced Clear Channel's reliance on Cianci v. Safeco Insurance Co. of Illinois, 356 Ill.App.3d 767, 292 Ill.Dec. 407, 826 N.E.2d 548 (2005). In Cianci, four residents of a water-damaged home sued their homeowner's insurance company and two companies hired to clean and repair the home. Cianci, 356 Ill.App.3d at 771-72, 292 Ill.Dec. 407, 826 N.E.2d 548. The plaintiffs' amended complaint against the defendants alleged breach of contract, violation of the Insurance Code (215 ILCS 5/1 et seq. (West 2006)), negligence, consumer fraud and deceptive business practices, vicarious liability, and intentional or recklessly caused emotional distress. Cianci, 356 Ill.App.3d at 772, 292 Ill.Dec. 407, 826 N.E.2d 548. The plaintiffs settled with the insurance company for $150,000 and the first cleaning company for $30,000. The trial court issued orders finding the settlements were made in good faith, but also directed the settling parties to allocate the settlement amounts. Cianci, 356 Ill. App.3d at 773, 292 Ill.Dec. 407, 826 N.E.2d 548. Later, the trial court amended those orders to include certain allocations. Cianci, 356 Ill.App.3d at 774, 292 Ill.Dec. 407, 826 N.E.2d 548. Concerning the insurance company's settlement, the court allocated $15,000 among the four plaintiffs for their tort, statutory and vicarious liability claims and $135,000 for their contractual claims. Concerning the cleaning company's settlement, the trial court allocated the entire $30,000 among the four plaintiffs for their tort claims. Cianci, 356 Ill.App.3d at 774, 292 Ill.Dec. 407, 826 N.E.2d 548.
On appeal, the court found that the trial court's good-faith order was premature because the settling parties failed to allocate the settlement amounts among the plaintiffs' theories of recovery, and instead lumped together negligence claims, for which contribution could be available, with intentional tort and vicarious liability claims, for which contribution would not be available. Cianci, 356 Ill.App.3d at 782, 292 Ill.Dec. 407, 826 N.E.2d 548. That failure to allocate foreclosed the nonsettling defendant from seeking a setoff. *1021 Cianci, 356 Ill.App.3d at 783, 292 Ill.Dec. 407, 826 N.E.2d 548. Furthermore, the record contained no information upon which the trial court could have based its good-faith finding that the settlement amounts were within a reasonable range of the settling parties' fair shares of liability. Specifically, the case was still in the pleading stage, motions to dismiss were pending, and only one defendant had answered the amended complaint. Cianci, 356 Ill. App.3d at 783, 292 Ill.Dec. 407, 826 N.E.2d 548.
Here, in contrast, the settling parties did not disobey any of the trial court's orders. Moreover, the plaintiffs claims against nonsettling defendants concern only negligence claims for which contribution exists. Furthermore, the trial court had sufficient information in the record upon which to base its good-faith decision, including pleadings and memoranda. In addition, the bankruptcies of Epitome, Kyles and Hollins left their insurance policies as their only assets in this case, and plaintiffs could not pierce the corporate veil of Lesly Motors to subject Benodin to liability. See Johnson v. United Airlines, 203 Ill.2d 121, 136-37, 271 Ill.Dec. 258, 784 N.E.2d 812 (2003) (disproportionally small settlement was in good faith where eight plaintiffs received $1,000 each plus costs from the third-party defendant, a municipality which had claimed absolute immunity from all tort liability under the relevant statute).
We find no error in the trial court's determination that the form of the settling parties' release and later allocation among the plaintiffs of the payments from the QSF complied with the requirements of the Contribution Act.

II. Good-faith Determination
Next, Clear Channel argues that the trial court's determination that the settlement agreements were made in good faith was an abuse of discretion. Specifically, Clear Channel argues the settling defendants failed to meet their initial burden to show good faith and then the trial court erroneously imposed the more stringent clear and convincing evidence standard on Clear Channel. Clear Channel also argues that the totality of the circumstances shows that the settlements are inconsistent with the Contribution Act's policies where the amount paid by the settling defendants bore no relationship to their relative culpability; Benodin was culpable and should not be dismissed by merely tendering insurance coverage; the probability of recovery against Benodin was high; and the trial court failed to consider evidence of wrongful conduct, unfair dealing and collusion. Furthermore, Clear Channel complains that the trial court ignored that the nonsettling defendants "had virtually no opportunity to conduct discovery of the settling defendants."
Under the Contribution Act, whether a settlement has been made in good faith is a matter within the sound discretion of the trial court and one that must be based upon consideration of the totality of the circumstances. Johnson, 203 Ill.2d at 135, 271 Ill.Dec. 258, 784 N.E.2d 812. "The amount of a settlement must be viewed in relation to the probability of recovery, the defenses raised, and the settling party's potential legal liability." Johnson, 203 Ill.2d at 137, 271 Ill.Dec. 258, 784 N.E.2d 812. In determining whether the settlement was made in good faith, the trial court may also consider whether the settlement was supported by consideration. Wreglesworth v. Arctco, Inc., 317 Ill.App.3d 628, 633, 251 Ill.Dec. 363, 740 N.E.2d 444 (2000). Additionally, the trial court may consider: (1) whether the amount paid by the settling tortfeasor was reasonable; (2) whether there was a personal relationship between the settling *1022 parties; and (3) whether the settling parties attempted to conceal the terms of the settlement. Wreglesworth, 317 Ill.App.3d at 634, 251 Ill.Dec. 363, 740 N.E.2d 444.
The settling party initially bears the burden of proof of showing that the settlement was made in good faith. Johnson, 203 Ill.2d at 132, 271 Ill.Dec. 258, 784 N.E.2d 812. The settling party's initial showing of good faith can be satisfied by showing that the settlement is reasonable and fair in light of the two policies underlying the Contribution Act of promoting settlements with a fair apportionment of damages among tortfeasors. Johnson, 203 Ill.2d at 133, 271 Ill.Dec. 258, 784 N.E.2d 812.
After the settling party has met its burden to show good faith, the burden shifts to the party challenging the settlement to show by a preponderance of the evidence that the settlement was not made in good faith. Johnson, 203 Ill.2d at 132, 271 Ill.Dec. 258, 784 N.E.2d 812. A settlement is not made in good faith if there is evidence that the settling parties engaged in "wrongful conduct, collusion or fraud" or if the settlement "conflicts with the terms of the Act or is inconsistent with the policies underlying the Act." Johnson, 203 Ill.2d at 134, 271 Ill.Dec. 258, 784 N.E.2d 812. Upon review, we will overturn the trial court's determination of good faith only where there has been an abuse of discretion. Johnson, 203 Ill.2d at 135, 271 Ill.Dec. 258, 784 N.E.2d 812.
A review of the circumstances surrounding the settlement between plaintiffs and the settling defendants supports the trial court's finding that their settlement was entered in good faith. We find that the settling parties met their initial burden. The motion for a good-faith finding set forth the terms of the settlement, including the valid consideration. The trial court held a hearing and had before it a legally valid and detailed settlement agreement contained within the parties' proposed orders; the pleadings; facts concerning the bankruptcies of the settling defendants and their insurance coverage; the deposition of Benodin, which established that plaintiffs would not be able to pierce the corporate veil to hold him personally liable; representations by counsel concerning the evidence of the culpability of the remaining defendants; and no evidence of wrongful conduct, collusion or fraud by the settling parties.
Once the settling parties made a preliminary showing, the burden shifted to Clear Channel to prove a lack of good faith by a preponderance of the evidence. Johnson, 203 Ill.2d at 132, 271 Ill.Dec. 258, 784 N.E.2d 812. Clear Channel correctly argues on appeal that the trial court erroneously applied a clear and convincing evidence standard to Clear Channel. Nevertheless, such error does not constitute reversible error because the record establishes that Clear Channel failed to meet the preponderance of the evidence standard. See Johnson, 203 Ill.2d at 135, 271 Ill.Dec. 258, 784 N.E.2d 812 (court affirmed the trial court's good-faith finding, which was rendered under the erroneous clear and convincing standard, where the appellant failed to show any evidence of bad faith).
We are not persuaded by Clear Channel's argument that the amount of the settlement here was an indication of bad faith. The small amount of a settlement or a disparity between the settlement amount and the ad damnum in the complaint is not an accurate measure of the good faith of a settlement. Johnson, 203 Ill.2d at 136-37, 271 Ill.Dec. 258, 784 N.E.2d 812. Here, the $2.5 million settlement was the best amount available under extraordinarily poor circumstances. The *1023 facts established that after their bankruptcies, the individual debts of Kyles and Hollins were discharged and the bankruptcy trustee reported that Epitome had no assets available to administer for creditors. Furthermore, there was no evidence to substantiate liability under the dramshop statute. Although Kyle, Hollins, and Epitome had a large degree of potential liability, their financial circumstances made the probability of recovery against them slim, and any recovery against Kyles and Hollins was limited by the bankruptcy court to their insurance. That insurance, however, was the subject of a coverage dispute and, thus, at risk. In addition, documentary evidence and Benodin's deposition established that he was not subject to individual liability because he was not acting in any capacity other than as an officer of Lesly Motors, which put the limit of its corporate liability insurance policy toward the total settlement. Lesley Motorsrather than Benodinowned the real estate that was leased to Epitome, and Benodin was not involved in any decisions concerning Epitome's security, policy or operation. Because the plaintiffs had no likelihood of establishing Benodin's personal liability, the trial court properly refused to allow inquiry into his personal assets. Furthermore, the trial court properly exercised its discretion by staying civil discovery to protect Kyles' and Hollins' fifth amendment privilege when they were indicted for involuntary manslaughter based upon the E2 nightclub incident.
As the trial court noted, Clear Channel failed to offer any evidence that showed the settling defendants and plaintiffs engaged in wrongful conduct, collusion, or fraud, nor was the settlement shown to conflict with the terms of the Contribution Act or its underlying objectives. The trial court properly concluded that Clear Channel failed to satisfy its burden of proof. Accordingly, the trial court properly granted plaintiffs' and the settling defendants' motions for a good-faith finding.

CONCLUSION
For the reasons explained above, we affirm the judgment of the circuit court. Affirmed.
FITZGERALD SMITH, P.J., and TOOMIN, J., concur.