NOTICE

Decision filed 04/18/18. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2018 IL App (5th) 160161

NO. 5-16-0161

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MARTHA CUSTER, *et al.*, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 09-L-295[*] |
| | ) | |
| CERRO FLOW PRODUCTS, INC.; PHARMACIA | ) | |
| CORPORATION, n/k/a Pharmacia LLC; | ) | |
| PHARMACIA & UPJOHN COMPANY LLC; | ) | |
| SOLUTIA, INC.; MONSANTO COMPANY; | ) | |
| PFIZER, INC.; MONSANTO AG PRODUCTS | ) | |
| LLC, n/k/a Monsanto Company; and EASTMAN | ) | |
| CHEMICAL COMPANY, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Vincent J. Lopinot, |
| (Cerro Flow Products, Inc., Defendant-Appellant; | ) | Judge, presiding |
| Pharmacia Corporation; Pharmacia & Upjohn | ) | |
| Company LLC; Solutia, Inc.; Monsanto Company; | ) | |
| Pfizer, Inc.; Monsanto Ag Products LLC; and | ) | Honorable |
| Eastman Chemical Company, Defendants- | ) | Andrew J. Gleeson, |
| Appellees). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Justices Chapman[**] and Moore concurred in the judgment and opinion.

**OPINION**

_____

[*]A full listing of trial court case numbers is set forth in the appendix.

[**]Justice Overstreet was originally assigned to the panel but recused himself. Justice Chapman was substituted and has read the briefs and listened to the recording of the oral argument.

1

¶ 1    Defendant, Cerro Flow Products, Inc. (Cerro), appeals from orders of the circuit court finding that an aggregate settlement agreement between 11,546 plaintiffs and defendants—Pharmacia Corporation, now known as Pharmacia LLC; Pharmacia & Upjohn Company LLC; Solutia, Inc.; Monsanto Company; Monsanto AG Products LLC, now known as Monsanto Company; and Eastman Chemical Company (collectively referred to as "Monsanto defendants")—was made in "good faith," within the meaning of the Joint Tortfeasor Contribution Act (Contribution Act) (740 ILCS 100/0.01 *et seq.* (West 2014)). For the following reasons, we vacate the good-faith orders and remand this cause for further proceedings consistent with this opinion.

¶ 2                                 I. BACKGROUND

¶ 3    This appeal concerns 131 mass tort cases, filed on behalf of 11,546 plaintiffs, who alleged that they suffered personal injuries and property damage resulting from exposure to hazardous substances and contaminants emitted from three "release sites" in or near the village of Sauget, Illinois. The release sites were identified as (1) a 90-acre landfill site (Sauget landfill), (2) a 314-acre plant operated by one or more of the Monsanto defendants (Monsanto facility), and (3) a parcel of property abutting the Monsanto facility that was owned and operated by Cerro (Cerro facility).

¶ 4                                 The 2009 Cases

¶ 5    The litigation began in June 2009, with the filing of 20 cases (collectively referred to as "the 2009 cases") against the Monsanto defendants and Cerro. In most of the cases, there were between 70 and 99 individual plaintiffs joined in a single complaint. A total of 1022 individuals were named as plaintiffs in the 2009 cases.

2

¶ 6 The plaintiffs brought personal injury and property damage claims against the Monsanto defendants and Cerro for allegedly releasing polychlorinated biphenyls (PCBs), dioxins, furans, and other hazardous substances into the environment. More specifically, the plaintiffs alleged that the Monsanto defendants produced, stored, and disposed of PCBs at the Sauget landfill and the Monsanto facility, resulting in the release of the hazardous substances into the environment. The plaintiffs further alleged that Cerro, as part of its recycling operations, scrapped PCB transformers and drained manufacturing waste and PCB oil into a creek, which ran through the Cerro facility, resulting in the release of large quantities of hazardous substances into the environment. The plaintiffs asserted that the hazardous substances were released through emissions, spillage, incomplete incineration of PCBs, improper burning of contaminated waste, improper discharge into surface waters and wastewater systems, and improper disposal. They claimed that the release of these substances created health risks, and contaminated real property, including nearby streams and groundwater, within a two-mile radius of one or more of the release sites ("the affected areas"). The plaintiffs claimed that hazardous substances had been released into the affected areas for more than 70 years and that the defendants actively concealed the health risks and property contamination caused by the release of these substances.

¶ 7 The personal injury claims were based on theories of negligence, strict liability/ultrahazardous activity, nuisance, and battery. The plaintiffs alleged they suffered one or more of the following diseases or conditions: diabetes, hypertension, depression, sinusitis, anemia, endometriosis, fibroid tumors, anxiety, gout, heart disorder, arthritis, hysterectomy, diverticulitis, ovarian cysts, thyroid problems, noncancerous tumors, hypercholesterolemia, upper respiratory infection, heart disease, urinary tract infection, asthma, leukemia, chronic bronchitis, congestive heart failure, emphysema, osteoporosis, stomach disease/disorder,

3

pancytopenia, thrombocytopenia, bone diseases, leucopenia, myelodysplasia, migraines, and various forms of cancer.

¶ 8    The property damage claims were based on theories of negligence, nuisance, and trespass. The plaintiffs alleged that they suffered injury and damage in the form of "cost to remediate" their real property and "diminution in value" of the real property.

¶ 9    On August 3, 2010, the parties informed the trial court that they had entered into a tolling agreement, effective June 18, 2010, which provided for a stay of all nondiscovery issues while they attempted to mediate the contested issues. Pursuant to that agreement, the court ordered a stay of the proceedings. Over the next three years, the parties engaged in mediation. The mediation between the plaintiffs and Monsanto defendants was apparently successful, concluding in November 2014, with a tentative agreement (hereinafter the Settlement Agreement) to settle not only the 2009 cases but also the claims of thousands of other individuals who had not yet filed lawsuits, based upon injuries arising from the same environmental exposure. Cerro was not a party to the proposed settlement, and its mediation efforts with the plaintiffs ended without an agreement.

¶ 10                                    The 2014 Cases

¶ 11   On or about June 3, 2014, an additional 111 cases (the 2014 cases), naming more than 10,000 new plaintiffs, were filed against Cerro. Because of the pending Settlement Agreement, the Monsanto defendants were not sued. The allegations in the 2014 cases were similar to those brought against Cerro in the 2009 cases. The plaintiffs alleged that Cerro released hazardous substances into the environment at the Cerro release site and that, as a direct and proximate result of environmental exposure to those hazardous substances, the plaintiffs suffered injuries "in the form and manner described in Exhibit A." Exhibit A, attached to the complaint, is a table that

4

contains columns with the following headings: "ID," "Name," Minimum Number of Years," "Cancer," and "Other Conditions." Rows beneath each column contain a unique identification number for each plaintiff, the plaintiff's name, a number indicating the minimum years of alleged exposure, and an "X" marked in the column for either "Cancer" or "Other Conditions."

¶ 12 On June 23, 2014, Cerro filed a motion to lift the stay order in the 2009 cases because its mediation efforts with the plaintiffs had been unsuccessful. On July 8, 2014, the trial court issued an initial case management order covering the 2009 cases and the 2014 cases. As part of that order, the court lifted the stay as to the claims made against Cerro in the 2009 cases. The court also permitted the plaintiffs and Cerro to resume discovery and trial preparations for the 2009 cases and the 2014 cases.

¶ 13 The Qualified Settlement Fund

¶ 14 On August 6, 2015, the plaintiffs in the 2009 cases filed a motion to establish a "Qualified Settlement Fund" and to appoint Lexco Consulting LLC as the administrator of the fund. In the motion, the plaintiffs indicated they had reached a confidential settlement with the Monsanto defendants and thereby resolved the claims of over 11,000 individuals. They unequivocally stated that this was not a motion for a finding of good faith or a request for an order approving the settlement. The plaintiffs asserted that under the terms of the November 14, 2014, Settlement Agreement, the Monsanto defendants would soon make their first settlement payment. They noted that the exact amount of compensation that each individual would receive had not yet been determined and the exact distribution of settlement funds for compensation, and for subrogation or reimbursement, could not yet be finalized. The plaintiffs asserted that no settlement proceeds would be "set apart" for a particular settling plaintiff or claimant or "otherwise made available so that he or she may draw upon or otherwise control said settlement

5

proceeds," until such time that a distribution of the settlement proceeds for each settling plaintiff or claimant could be identified.

¶ 15    The plaintiffs represented that the Qualified Settlement Fund satisfied pertinent federal regulations and requested a court order finding "that the account and the settlement payment arrangements meet the criteria for a Qualified Settlement Account" under section 468B of the Internal Revenue Code (26 U.S.C. § 468B (2012)) and the corresponding Treasury Regulation (Treas. Reg. § 1.468B-1(c) (2012)). The plaintiffs claimed that the establishment of a Qualified Settlement Fund was beneficial because it would "introduce a degree of breathing space after settlement because the money temporarily parked in the Qualified Settlement Fund is not yet 'constructively received' by any Settling Plaintiff or Claimant, as set forth in Treas. Reg. §1.451-2(a) (26 C.F.R. §1.451-2(a))." The plaintiffs acknowledged that a Qualified Settlement Fund would allow the Monsanto defendants to take a tax deduction for qualified payments to the fund and that the tax benefit could occur before the payment amounts were determined for the individual plaintiffs and claimants.

¶ 16    The plaintiffs indicated that in accordance with the provisions of the Settlement Agreement, the Qualified Settlement Fund account would be held in a trust, governed by a trust agreement (Trust Agreement), with plaintiffs' counsel serving as trustees (Trustees). The Trustees would select a fund administrator (Fund Administrator), to whom the Trustees were "empowered to delegate certain functions required to fully comply with the Settlement Agreement or effectuate the purposes of the Trust." The Fund Administrator would also be authorized to distribute all attorney fees and litigation expenses to plaintiffs' counsel. It was noted that plaintiffs' counsel would not be paid a separate fee to serve as Trustees. The plaintiffs requested that the circuit court approve Lexco Consulting LLC (Lexco), an entity located in

Birmingham, Alabama, as the Fund Administrator. The plaintiffs represented that Lexco "submits personally to the jurisdiction of the court." Lexco, however, did not provide an affidavit or other document affirming that it would submit to the jurisdiction of the circuit court of St. Clair County. The plaintiffs added, "So long as the Fund Administrator substantially and without negligence complies with the applicable terms of the Settlement Agreement, Trust Agreement, or instructions issued by Trustees regarding distribution and allocating the settlement funds or any applicable Court Order, the Fund Administrator shall be indemnified and held harmless by the Fund." The plaintiffs vowed that after all settlement money had been allocated, the Trustees, with the assistance of the Fund Administrator, would "jointly prepare an accounting detailing all distributions from the Qualified Settlement Fund," and that this accounting would "be available to the Court upon request." The plaintiffs asserted that if the court entered an order establishing the Qualified Settlement Fund, the court would retain jurisdiction over the fund.

¶ 17    On August 6, 2015, the trial court entered an order in the 2009 cases, granting the motion to establish the Qualified Settlement Fund. This order was entered on the same day that the motion was filed, and there is no indication that a hearing was held that day. The court approved Lexco as the Fund Administrator "pursuant to the terms, conditions and restrictions" set forth in the plaintiffs' motion. The court authorized the Fund Administrator "to conduct any and all activities assigned to it by the Trustees which are necessary to administer the Fund" as described in the plaintiffs' motion. The court directed that "the Trustees, with assistance of the Fund Administrator, shall jointly prepare an accounting" detailing all distributions from the Qualified Settlement Fund. The court stated that it "shall retain continuing jurisdiction over the Fund pursuant to Treas. Reg. §1.468B-1(c)(1) and over the Trustees and Fund Administrator."

7

¶ 19    On March 4, 2016, the plaintiffs in the 2009 cases filed motions requesting that the trial court find that their settlement with the Monsanto defendants was made in good faith, as defined in the Contribution Act, and order the dismissal of those claims with prejudice. In support, the plaintiffs asserted that they "each received certain moneys, and acknowledge receipt of said moneys, and may in the future receive additional moneys, as provided in the settlement agreement." The plaintiffs also asked the court to enter an order discharging any potential liability of the settling defendants to other tortfeasors and barring any and all contribution claims that have been asserted, or could have been asserted, by or against the settling defendants. Finally, the plaintiffs sought an order directing that the Settlement Agreement and each release (hereinafter the Release) be filed under seal. The plaintiffs' motion was set for a hearing on March 29, 2016.

¶ 20    On March 22, 2016, Cerro filed a motion to continue the good-faith hearing. Cerro argued that on March 21, 2016, it received 1003 pages of settlement documents covering over 11,000 plaintiffs and that it needed time to prepare for a hearing involving a "complicated," "voluminous" settlement. The Monsanto defendants filed a response in opposition to Cerro's motion for a continuance, arguing that "contrary to Cerro's implications, the 'terms' of the settlement agreement could be found in 34 pages of the settlement agreement" and that Cerro participated in mediation and was well aware of the "settlement concept." The Monsanto defendants further argued that the plaintiffs received "money consideration" from the settling defendants and "therefore the agreement is presumed to be in good faith."

¶ 21    On March 29, 2016, the parties appeared in court for the hearing on plaintiffs' good-faith motions and Cerro's request for a continuance. Two circuit court judges, Judge Andrew Gleeson

and Judge Vincent Lopinot, were assigned to these cases, and they jointly presided over the good-faith hearing.

¶ 22   During the hearing, Cerro argued for a continuance, asserting that it had not been given adequate notice of the hearing date and that it had not had sufficient time to review the settlement documents in order to consider its position on the motion for a finding of good faith. Cerro noted that it did not receive the settlement documents until the afternoon of March 21, 2016, and that it was not provided with the individual copies of the Release signed by the plaintiffs. Cerro argued that one of the issues before the court was whether the settlement was "consistent with the purposes of the Contribution Act, which deals with equitable apportionment." Cerro stated that it was not prepared to address that issue without basic information about the settlement. Cerro also argued against a finding of good faith, noting that without the settlement information, such a finding was premature.

¶ 23   Plaintiffs' counsel objected to the continuance, arguing, "[n]o set of facts are going to change between now and whenever they want this heard." Counsel also argued that good-faith settlements are normally done "routinely." Counsel for the Monsanto defendants also opposed the continuance, arguing that there is a presumption that settlements are made in good faith. Counsel noted that the Monsanto defendants had paid more than $10 million into a settlement fund, that money had been distributed to the parties by the Fund Administrator, and that the settling defendants have more than 10,000 copies of the Release signed by individual plaintiffs. He indicated that the copies of the Release could be shown to the court, or to Cerro, "should they be so inclined." Counsel advised the court that an initial amount of money had been distributed equally to all of the plaintiffs and that a fund would be set up "based on testing, disease, and— closeness to the plant that will be distributed blind from Monsanto by an administrator selected

9

by these two mediators who have participated." He argued that there had been "an awful lot of work" by plaintiffs' counsel and, "where money has changed hands, there is a presumption that the settlement is valid." Plaintiffs' counsel then added, "Judge Baricevic *** is the one who approved the payoff of roughly ten million dollars, I don't know, six months ago or four months or whenever it was, and there was no opposition at that time."

¶ 24 In response, Cerro's counsel pointed out that Judge Baricevic had entered an order establishing a Qualified Settlement Fund. Counsel recalled that the plaintiffs, in their motion to establish the Qualified Settlement Fund, specifically stated they were not requesting a finding of good faith, or an order approving the settlement. Counsel argued that "to somehow insinuate" that the settlement has been approved is "just not accurate." He noted that Cerro was not presently asserting that the Settlement Agreement was a bad-faith settlement, because it simply did not know. He stated that Cerro was "looking more at equitable apportionment" because "we don't even know what the individual claimants are getting right now."

¶ 25 At this point in the proceedings, the judges conferred off the record. Judge Gleeson then announced the ruling from the bench:

"Obviously an interesting, complex case. The Court looks at good-faith findings and good-faith settlements and looks at those in terms of judicial economy. In this particular case—and with that there is a presumption that settlements are in good faith.

Having been involved in this case, both Judge Lopinot and I recognize that this settlement concept has been readily known to the parties for quite some time. Cerro has participated in the litigation, has participated in the mediation in this

10

particular case. There are no allegations before This Court of any collusion or fraud.

Litigation—our whole judicial system in a sense is premised on the fact that we want to promote settlement before the parties, settlements that, perhaps, are negotiated at arms' length; that each party has a give and take such that it's a value that they can both live with, maybe, perhaps, not the happiness [*sic*] about but one that's formulated in this particular instance between the parties and between the mediation that took place.

There is a substantial amount of money that's been extended in this settlement. It seems to This Court that it's consistent with the Contribution Act. It seems that it enforces the concept that we want to promote settlement, particularly in complex, extensive, sensitive litigation such as this.

Both Judge Lopinot and I believe that this settlement is in good faith; that the parties have had a reasonable time to contemplate what the settlement meant to each side. As such, we're denying the motion for continuance with respect to this particular matter. We find that this settlement is a—is one that's in the best interest of the parties. We find that it's one that serves judicial economy, and we find that it's in good faith. That will be the order of This Court."

¶ 26    Following the court's ruling, Cerro asked, and was allowed, to make a record of its position on good faith. Cerro argued that a decision on good faith was premature because the court does not know "whose [*sic*] getting what." Counsel observed that there were no provisions in the Settlement Agreement explaining "how the distribution is to be done." Counsel acknowledged that the court had discretion in deciding whether to allow an evidentiary hearing

11

on a good-faith motion and pointed out that there was precedent for evidentiary hearings in cases where the settling parties were unable to present information regarding the value of a settlement or how the proceeds would be allocated.

¶ 27 In response, counsel for the Monsanto defendants reiterated that the Monsanto defendants had paid $10 million to the settling plaintiffs, and "while unlikely, it is possible that the total amount of consideration that will be paid in this event has already been paid," plaintiffs' counsel agreed. No evidence or exhibits were offered during the hearing, and there is no indication that the presiding judges were presented with, or reviewed, the Settlement Agreement prior to ruling on the plaintiffs' motion for a finding of good faith.

¶ 28 In a written order entered on March 29, 2016, the trial court granted the plaintiffs' motion for a finding of good faith in the 2009 cases and dismissed the plaintiffs' claims against the Monsanto defendants, with prejudice. The court further ordered that, pursuant to the Contribution Act, any potential liability of the settling defendants to other tortfeasors was discharged and any and all contribution claims asserted, or that could be asserted, by or against the settling defendants, were barred. The court directed that "the settlement agreement and each release, as well as the transcript of the March 29 hearing, shall be filed under seal subject to the further order of the court." According to the record, a copy of the Settlement Agreement and the corresponding exhibits were filed in the 2009 cases, under seal, that same day. Finally, the court found that there was no just reason for delaying an appeal of its order.

¶ 29 On May 19, 2016, Cerro filed a third-party complaint in the 2014 cases, seeking contribution against the Monsanto defendants. Cerro alleged that the Monsanto defendants produced, stored, and/or disposed of materials containing PCBs, dioxins, and furans, which resulted in the release of such substances into the environment in the affected areas described in

12

the 2014 complaints. In a prayer for relief, Cerro asserted that if it is found liable, then the Monsanto defendants should be found jointly and severally liable for plaintiffs' damages in an amount commensurate with their relative degree of culpability.

¶ 30     On June 13, 2016, the plaintiffs filed a motion for a good-faith finding in the 2014 cases. The plaintiffs asked the court to find that the November 21, 2014, settlement was made in good faith and to dismiss, with prejudice, all contribution claims asserted against the settling defendants. The plaintiffs also requested an order discharging any potential liability of the Monsanto defendants to other tortfeasors and barring all contribution claims that have been asserted, or that could have been asserted, by or against the Monsanto defendants.

¶ 31     On June 22, 2016, Cerro filed a brief in opposition to the plaintiffs' motion for a good-faith finding. Cerro argued that the proposed Settlement Agreement simply established a "settlement protocol" and lacked the "factual detail necessary to evaluate whether this settlement was made in 'good faith' as that term is defined in Illinois law." Cerro claimed that the Settlement Agreement was deficient in that it did not identify the total amount of the settlement or allocate the settlement dollars among the respective claimants and their claims. Cerro argued that, without this information, the trial court could not properly evaluate whether the settlement was fair and made in good faith, "as opposed to contrived or manipulated in a fashion that would unfairly prejudice Cerro." Cerro further argued that the deficiencies in the agreement would substantially prejudice its ability to obtain a setoff of the sums paid by the Monsanto defendants, should the court find that the settlement was made in good faith. Cerro asked the court to find that the good-faith motion was premature and deny it. In the event the court granted the motion, Cerro asked the court to retain jurisdiction in order to "review and approve the future allocation

13

of the settlement proceeds" and preserve Cerro's objections to "the future allocation for purposes of setoff."

¶ 32 On June 23, 2016, plaintiffs' motion was called for a hearing before Judge Gleeson and Judge Lopinot. Initially, plaintiffs' counsel presented a copy of the Settlement Agreement, without the exhibits, to the court. Plaintiffs' counsel noted that the court had made a finding of good faith regarding the same agreement in the 2009 cases and reminded the court of the strong public policy in favor of promoting settlements. Counsel argued that this was "massive litigation" that had been pending for a long time and that the settlement resulted following mediation sessions with all of the parties' attorneys, including Cerro's. Counsel asserted that this was a valid legal settlement that was obtained after the parties exchanged "massive amounts" of discovery and engaged in 10 mediation sessions, initially facilitated by a retired circuit court judge and later joined by a renowned mediator.

¶ 33 During argument on the motion for a good-faith finding, plaintiffs' counsel referred to exhibit No. 7 of the Settlement Agreement. After pausing to note that the court had not been provided with exhibit No. 7, or any of the other exhibits referenced in the settlement, counsel continued with his argument. He stated that "the protocol that has been arranged" and "the core of the ongoing settlement and how people will get paid" was set forth in exhibit No. 7. Counsel explained that there would be a fixed sum of money deposited in three settlement funds: a settlement fund for the deceased, a settlement fund for the property owners, and a settlement fund for those living participants in this lawsuit. Counsel noted that the funds will be "funded through a process, a protocol that was developed between the parties, and if you want to study it in detail it is on file." He continued:

14

"Essentially what is going to happen and is in the process of happening actually, blood tests have been taken. Six hundred of the 11,000 plaintiffs were chosen randomly to be tested and have their blood tested for the level of PCBs and toxins in their blood system as opposed to the general population at large. These are people within that class, *** the 11,000 tort claimants that you're considering finding this settlement appropriate for.

They live within a 6 mile radius of Sauget plants of Cerro and Monsanto. So they've got that smell in their nose every day ***. And they live [*sic*] next to it for a period of time, so they're going to be—600 of them are going to be tested and based upon that there is an objective process to extrapolate from that in findings that are reached and depending upon that level there is a fund that's going to be created and that fund will be administered objectively by an administrator who is going to—who has his marching orders under objective guidelines to arrive at an allocation between the 11,000 plaintiffs. And that essentially is the process by which payment will be made in this case.

Now while it is not known at this point exactly or precisely how much money will be in this fund to be allocated, there is known at this time that there will be more monies, that $10,000,000 has already been put aside for the settling plaintiffs, that some percent of those plaintiffs have agreed to this agreement and not opted out. And we have today and want to put on file on CDs the agreements, the releases that they have signed and we'll have that on file today."

¶ 34 In response, Cerro's counsel pointed out that while the plaintiffs' attorney represented that there were three funds that will be administered by an "independent administrator," the

15

Settlement Agreement indicates that there is "a trust agreement for the distribution" and that the plaintiffs' counsel will serve as Trustees of that Trust. Counsel pointed out that no one has ever seen the Trust Agreement. Counsel argued that the Settlement Agreement before the court involved "thousands upon thousands of individual settlements" and that, until there is "an allocation of these thousands upon thousands of individual settlements," a finding of good faith is "premature." Counsel concluded that the court did not have sufficient information to "stamp" the settlement with a good-faith finding because the terms were unknown.

¶ 35 In rebuttal, plaintiffs' counsel claimed that the Settlement Agreement was "a unique settlement" in that the plaintiffs were asking for a finding of good faith "when every one of these plaintiffs have already received settlement money of $600 a piece when they signed the releases." Counsel further argued that the settlement funds would be allocated through an administrator who has objective guidelines that have to be followed, and that neither the court nor the plaintiffs and their counsel would want court approval of every single allocation. Plaintiffs' counsel added that the court was capable of ruling on good faith without a precise determination of the overall damages and the proportionate liability of the settling defendants. Counsel also objected to Cerro's alternative request that the trial court retain jurisdiction.

¶ 36 No testimony or other evidence was offered during the hearing. At the conclusion of the arguments of counsel, the two presiding judges conferred off the record. Judge Lopinot then issued a ruling from the bench. Initially, the court found that there had been no showing by Cerro that these settlements were not in good faith. The court noted that the plaintiffs had received some compensation and that there was a framework for additional compensation. The court found that counsel's point regarding the approval of allocations was well taken, asking how the

16

court "would oversee that in any other way other than what the settlement agreement has proposed."

"We understand the defendant's arguments with regard to allocation and so forth but since apparently it's going to the Appellate Court anyway, I suppose that the Appellate Court could give us some indication with regard to allocation on these other issues if something else is needed. So in essence we are going to approve the good faith findings with regard to these settlements."

¶ 37    On June 23, 2016, the court entered a written order granting the plaintiffs' motion for a good-faith finding. The order provided:

"Pursuant to the Contribution Act, any potential liability of the settling companies to other tortfeasors with respect to the aforesaid plaintiffs is DISCHARGED. Further, all contribution claims asserted against the settling companies with respect to the aforesaid plaintiffs are DISMISSED WITH PREJUDICE, and all contribution claims that could have been or could be asserted by or against settling companies with respect to the aforesaid plaintiffs are BARRED."

The court further ordered that "the settlement agreement and each release, as well as the transcript of the hearing on this matter, shall be filed under seal." Finally, the court found there was no just reason to delay an appeal of the order. Thus, the Monsanto defendants were completely discharged from any liability to Cerro.

¶ 38                              The Settlement Agreement

¶ 39    The confidential Settlement Agreement between the plaintiffs and the Monsanto defendants is dated November 21, 2014. The agreement contains 32 pages of text and a signature page. An index of exhibits, along with 15 exhibits and addenda, are appended to and referenced

17

in the Settlement Agreement, adding 955 pages of material. The exhibits are not tabbed, and the index does not offer a starting page number for each exhibit and addendum.

¶ 40 The general nature of the plaintiffs' claims is summarized on the second page of the Settlement Agreement as follows:

"Whereas, the PLAINTIFFS/CLAIMANTS assert claims for negligence, strict liability, ultra hazardous activity, public nuisance, private nuisance, trespass, battery, or otherwise seeking relief, *inter alia*, for all past, present, and future alleged real and personal property damage, bodily and personal injury, lost wages, earnings and income, diminution of property value, loss of use and enjoyment, remediation, exposure to chemicals, discomfort, disruption, fear, fright, inconvenience, medical expenses, other expenses, pain, suffering and mental anguish and distress, medical monitoring or punitive damages related to PLAINTIFFS/CLAIMANTS' or DECEDENTS' alleged exposure to hazardous or harmful substances or materials allegedly manufactured, produced, distributed, sold, marketed, disposed of, and/or released by the RELEASED PARTIES from current or former facilities in the Sauget/Cahokia, Illinois, and St. Louis, Missouri areas."

¶ 41 In subsequent paragraphs, there are provisions indicating that the "RELEASED PARTIES" have denied all liability and that the "PLAINTIFFS/CLAIMANTS" (Plaintiffs/Claimants) have agreed "to compromise, settle and dismiss with prejudice all claims asserted, or which could have been asserted against the RELEASED PARTIES in the LAWSUITS or otherwise, on the bases hereinafter set forth."

18

¶ 42    The Settlement Agreement also includes a section of definitions. This section is more than five pages in length and contains descriptions or definitions for 34 words or phrases used in the text of the Settlement Agreement.

¶ 43    Additionally, the Settlement Agreement contains an "OPT OUT" (Opt Out) provision. According to the Opt Out provision, the settlement was conditioned upon participation by 100% of the "LIVING PLAINTIFF/CLAIMANTS" (Living Plaintiffs/Claimants). If 100% participation was not obtained, the settlement was "voidable at the option and in the sole discretion" of the Monsanto defendants. If the Monsanto defendants opted to void the settlement, all monies previously paid into the "ESCROW ACCOUNT" (Escrow Account), including accrued interest, would be returned to the Monsanto defendants. If the Monsanto defendants elected to go forward without 100% participation, the $10 million previously paid into the Escrow Account would be transferred into a "TRUST," held by "PLAINTIFFS' COUNSEL," for the benefit of "PLAINTIFFS/CLAIMANTS." The Opt Out date was set 180 days from the date of execution of the Settlement Agreement.

¶ 44    By all accounts, plaintiffs' counsel was unable to obtain 100% participation. Because there was a sufficiently high level of participation, the Monsanto defendants elected to proceed with the settlement. Thus, in exchange for executing the Release, each living plaintiff or claimant received $600. The Settlement Agreement also provided that new money would be deposited into additional settlement funds pursuant to a schedule outlined in paragraph 7 of the Settlement Agreement. The Trust was to be held jointly by all of the plaintiffs' attorneys for the benefit of their clients. The plaintiffs' attorneys were the Trustees of the Trust.

¶ 45    Under the Settlement Agreement, the Monsanto defendants have no role with respect to payouts to individual plaintiffs from the Trust. The Monsanto defendants are only obligated to

transfer funds to a Trust, jointly held by all of the plaintiffs' attorneys, and upon transfer, they "are no longer responsible for and are specifically relieved of responsibility for distribution of the funds." The Settlement Agreement provides that the Trustees' actions are to be guided by their fiduciary duties to the plaintiffs and claimants, consistent with the Settlement Agreement. It further provides that the Trustees' actions "*will also be governed by a TRUST AGREEMENT, which will outline in detail the distribution method for all settlement funds*." (Emphasis added.) The Settlement Agreement defines "TRUST AGREEMENT" as "*a trust document which, in addition to this SETTLEMENT AGREEMENT, will govern the distribution of monies from the TRUST*." (Emphasis added.) The Trust Agreement is not in the record on appeal, and there is no indication it was ever presented to the trial court for review.

¶ 46     The Settlement Agreement identifies "LIVING PLAINTIFFS/CLAIMANTS" as all living persons who have filed or will file lawsuits or claims against the Monsanto defendants on their own behalf. It identifies a "NON PARTICIPATING PLAINTIFF/CLAIMANT" as any individual Living Plaintiff/Claimant who is presented with the Settlement Agreement and the Release, and who elects not to participate in the settlement. Under the express terms of the settlement, the "NON-PARTICIPATING PLAINTIFFS/CLAIMANTS" will be "excluded from the settlement entirely, including all settlement funds."

¶ 47     The Settlement Agreement also distinguishes the group of Living Plaintiffs/Claimants from an additional 1370 plaintiffs, who were referred to as "DECEASED PLAINTIFFS/CLAIMANTS." Members of the latter group are identified as deceased individuals who lived in the affected area and whose family members are pursuing claims on their behalf. According to the Settlement Agreement, the $10 million "BASE SETTLEMENT FUND" (Base Settlement Fund) is intended to satisfy only the claims of the Living

20

Plaintiffs/Claimants and does not satisfy any portion of the claims of "DECEASED PLAINTIFFS/CLAIMANTS" or any property-damage claims.

¶ 48    In order to participate in the settlement, a Living Plaintiff/Claimant is required to sign the Settlement Agreement and the Release, titled "Release of All Claims (Living Plaintiff)." The Release, identified as exhibit No. 4, is included with the exhibits attached to the Settlement Agreement. The first page of the Release is found on page 547 of the Settlement Agreement. The Release contains three pages of text, single-spaced and printed in very small font, followed by two signature pages. Within the text of the Release, there are statements providing that the Monsanto defendants are released from liability for "any and all past, present and future claims" that were or could have ever been filed for every kind of alleged exposure, or continuing exposure, as well as for unknown claims. The Release also contains provisions dealing with Medicare and Medicaid liens. Attached to the Release is an "Authorization to Release Information." This authorization is executed in blank and permits the recipient to obtain medical information otherwise protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA). There is also an employment contract attached to the Release. The contract allows the settling plaintiff's counsel to represent that plaintiff's individual interests with regard to Medicare and Medicaid lien issues. Finally, the Release requires the settling plaintiff to make an affirmation, declaring whether he or she has been involved in a bankruptcy proceeding.

¶ 49                    The Additional Settlement Funds

¶ 50    The Settlement Agreement identifies four additional settlement funds, and establishes protocols and procedures for determining whether the Monsanto defendants will fund them. The protocols and procedures are referenced in the Settlement Agreement, and are more fully outlined within certain exhibits attached to the agreement.

21

¶ 51    According to the terms of the settlement, the Monsanto defendants agreed to transfer an additional $300,000 into the Trust to create "ADDITIONAL SETTLEMENT FUND #1" (Additional Settlement Fund No. 1). This fund is intended to compensate 600 living plaintiffs, who are selected at random and who agree to provide a blood sample for testing. According to protocols outlined in exhibit No. 7, a list of 1000 randomly selected plaintiffs will be generated, and the first 600 plaintiffs who agree to have their blood drawn will each be paid $500.

¶ 52    There is a penalty provision for those plaintiffs who refuse to consent to the blood draw. The penalty provision is found only in the Release, not in the Settlement Agreement. Under this penalty provision, if a plaintiff who is selected at random to participate in the blood draw refuses or fails to participate, "and such refusal or failure to participate is not based upon the written advice or instruction of a medical provider" or otherwise excused in writing by the settling defendants, that plaintiff's "right to participate in the distribution of any additional payments from Additional Settlement Funds 1-4 is hereby forfeited," and his or her distribution of total settlement proceeds "will be limited to the Base Consideration of six hundred dollars ($600)."

¶ 53    The procedures and protocols for gathering, testing, and analyzing the random blood samples are set forth in exhibit No. 8. According to the protocols, the number of living plaintiffs who have agreed to participate in the settlement by signing the Release will be divided by the total number of individuals who provide blood samples for testing (600). This formula will produce an "extrapolation factor," which determines the number of living plaintiffs that each person giving blood theoretically represents. The extrapolation methodology is described in paragraph 10.3 of exhibit No. 8. A data valuation company will analyze the results for each of the 600 blood samples, and place each sample into one of six tiers.

22

¶ 54 "ADDITIONAL SETTLEMENT FUND #2" (Additional Settlement Fund No. 2) is intended to provide additional compensation calculated pursuant to the six tiers of value set forth in exhibit No. 9. Recovery of monies from Additional Settlement Fund No. 2 is limited to living plaintiffs. Each tier has an assigned dollar value. The value in each of the six tiers is based on agreed-to PCB concentration percentiles. The first tier refers to blood samples with PCB concentrations greater than the ninety-fifth percentile, which has an assigned payment value of $250,000 per claimant. The second tier refers to samples where the PCB concentrations are at the ninety-fifth percentile, and such concentrations are valued at $12,500 per plaintiff. Concentrations ranging from the ninetieth percentile to less than the ninety-fifth percentile are valued at $8000 per claimant in the third tier. Concentrations ranging from the seventy-fifth percentile to less than the ninetieth percentile are valued at $4000 per claimant in the fourth tier. Concentrations ranging from the sixty-fifth percentile to the seventy-fifth percentile in the fifth tier are valued at $2000 per plaintiff. Samples below the sixty-fifth percentile are valued at $0 in the sixth tier. The data valuation company will then multiply the total number of samples placed into each of the six tiers by the "extrapolation factor" to determine, in theory, how many total plaintiffs fall into each of the six tiers.

¶ 55 According to exhibit No. 9, total compensation payments for the top tier are capped at $1.25 million. Thus, no more than five living plaintiffs could actually receive a $250,000 payment. If more than five living plaintiffs qualified at this level, the amount of compensation would be prorated. For example, if one-tenth of 1% of the 10,000 plaintiffs qualified at the top tier level, then each plaintiff would receive only $12,500—the same amount as the second-tier plaintiffs. Likewise, if each of the 600 blood samples falls into the lowest tier, the Monsanto defendants will not be required to deposit any additional money into the Trust. The Monsanto

defendants will have settled the claims of the participating living plaintiffs for $10.3 million. Thus, the amount to be paid into Additional Settlement Fund No. 2 could range from a staggering sum in excess of $300 million to nothing. The funds, if any, to be deposited into Additional Settlement Fund #2 were unknown at the time of the good-faith hearings because the PCB analysis had not been completed and the extrapolation factor had not been calculated. The Settlement Agreement does not define or describe how the Trustees (the plaintiffs' attorneys) of the Trust would allocate Additional Settlement Fund No. 2 among the individual living plaintiffs, should there be any money to allocate. As previously noted, the terms of a separate Trust Agreement control the distribution of funds from the Trust, but that Trust Agreement is not part of the record, and there is no indication that it was provided or disclosed in any of the proceedings before the trial court.

¶ 56　Although the families of the 1370 deceased plaintiffs were not included in the initial Base Settlement Fund, the settlement provides that any monies paid into "ADDITIONAL SETTLEMENT FUND #3" (Additional Settlement Fund No. 3") would be used to compensate these claimants. According to the Settlement Agreement, the amount of money that the Monsanto defendants will be required to deposit into Additional Settlement Fund No. 3 depends on the results of the random blood tests and the level of participation by the representatives of the deceased plaintiffs. Under the agreement, if 100% of the representatives execute a "DECEASED PLAINTIFF RELEASE," then the Monsanto defendants will pay an amount equal to 10% of the amount calculated for Additional Settlement Fund No. 2. If less than 100% of the representatives participate, then "the percentage multiplier (10%) will be reduced *pro-rata* by the percentage of those who refuse or fail to sign" a "DECEASED PLAINTIFF RELEASE." Because the value of Additional Settlement Fund No. 2 has not been determined, it is not

possible to calculate the amount of money that could be deposited in Additional Settlement Fund No. 3. Once again, the Settlement Agreement does not define or describe how the Trustees of the Trust would allocate the money, if any, among the families of deceased plaintiffs and claimants who participate and sign the Release.

¶ 57 "ADDITIONAL SETTLEMENT FUND #4" (Additional Settlement Fund No. 4) is a fund intended to compensate living plaintiffs who are able to provide proof of ownership of a parcel or parcels of real estate located within a six-mile radius of the Monsanto facility. The Settlement Agreement states that this fund is intended to provide "a monetary settlement of the various contested property damage claims based on alleged potential exposure and contamination of the property," as asserted by the plaintiffs. It further states that Additional Settlement Fund No. 4 is not "a remediation fund, and is not meant to cover the cost of any clean up." Thus, it provides no compensation for one of the damage claims alleged by the plaintiffs in the 2009 cases.

¶ 58 The Settlement Agreement identifies 4000 "properties whose owners are potentially eligible to recover from Additional Settlement Fund No. 4." Thus, if 90% of the eligible plaintiffs sign the Release and indemnity agreements, then the Monsanto defendants would be required to pay "an amount equal to five percent (5%) of ADDITIONAL SETTLEMENT FUND No. 2," to fund Additional Settlement Fund No. 4. The Settlement Agreement also provides that "the percentage multiplier (5%) will be reduced pro rata by the percentage of owners below the 90% threshold who fail to participate or provide the necessary documentation." For example, if only 50% of the property owners execute the Release and provide proof of ownership, the Monsanto defendants would pay 2.5% of the sum paid into Additional Settlement Fund No. 2. Given that the value of Additional Settlement Fund No. 2 has not been determined, and could be

zero, it is not possible to calculate the amount that might be paid into Additional Settlement Fund No. 4. Again, as with Additional Settlement Fund Nos. 2 and 3, the Settlement Agreement does not define or describe how the Trustees of the Trust will allocate any money among the plaintiffs who have asserted property damage claims.

¶ 59                                    II. ANALYSIS

¶ 60    On appeal, Cerro challenges the trial court's findings that the aggregate settlement of the 2009 cases, and the 2014 cases, was made in "good faith" within the meaning of the Contribution Act (740 ILCS 100/0.01 *et seq.* (West 2014)). Cerro timely appealed from the orders entered March 29, 2016, in the 2009 cases, and the orders entered June 23, 2016, in the 2014 cases. Subsequently, the appeals were consolidated for purposes of argument and decision.

¶ 61    The Contribution Act creates a statutory right of contribution where two or more persons are potentially liable in tort arising out of the same injury to a person or property or the same wrongful death. 740 ILCS 100/2(a) (West 2014). The right of contribution exists only in favor of a tortfeasor who has paid more than his *pro rata* share of damages to the injured party. 740 ILCS 100/2(b) (West 2014). When a release is given to a tortfeasor arising from a good-faith settlement, the release "does not discharge any of the other tortfeasors from liability *** but it reduces the recovery on any claim against the others" to the extent of any amount stated in the release, or in the amount of the consideration actually paid, whichever is greater. 740 ILCS 100/2(c) (West 2014). A tortfeasor who settles in good faith is discharged from all liability for contribution to any other tortfeasor. 740 ILCS 100/2(d) (West 2014). Thus, the Contribution Act serves two equally important public policies: encouraging settlement and equitable sharing of damages among tortfeasors. *Johnson v. United Airlines*, 203 Ill. 2d 121, 133, 784 N.E.2d 812, 821 (2003); *In re Guardianship of Babb*, 162 Ill. 2d 153, 171, 642 N.E.2d 1195, 1203 (1994).

26

¶ 62    The only restriction that the Contribution Act imposes on the parties' right to settle is that the settlement be made in good faith. *Johnson*, 203 Ill. 2d at 128. The term "good faith," however, is not defined in the Contribution Act, and there is no "single, precise formula for determining what constitutes 'good faith' within the meaning of the Contribution Act that would be applicable in every case." *Johnson*, 203 Ill. 2d at 134. Whether a settlement agreement is made in good faith is a matter to be determined by the trial court after considering all of the circumstances surrounding the settlement. *Guardianship of Babb*, 162 Ill. 2d at 162. The totality-of-the-circumstances analysis allows the trial court to effectuate the public policy favoring the peaceful settlement of claims, while vigilantly watching for any evidence of collusion, unfair dealing, or wrongful conduct by the settling parties. *Guardianship of Babb*, 162 Ill. 2d at 162. A settlement will not be found to be in good faith where it is shown that the settling parties engaged in wrongful conduct, collusion, or fraud. *Guardianship of Babb*, 162 Ill. 2d at 162. Additionally, a settlement agreement that conflicts with the terms of the Contribution Act or is inconsistent with its underlying policies cannot satisfy the good-faith requirement of the Contribution Act. *Johnson*, 203 Ill. 2d at 134.

¶ 63    The settling parties have the burden to make a preliminary showing of good faith. *Johnson*, 203 Ill. 2d at 129. In meeting this burden, the settling parties must show, at a minimum, the existence of a legally valid settlement agreement. *Johnson*, 203 Ill. 2d at 132. However, not all legally valid settlements will satisfy the good-faith requirement of the Contribution Act. In determining whether a settlement is reasonable, a court may require factual evidence, in addition to the settlement agreement itself, before determining, as an initial matter, whether the settlement is fair and reasonable in light of the policies underlying the Contribution Act. *Johnson*, 203 Ill. 2d at 132. Once the preliminary showing of good faith has been made by the settling parties, the

27

burden shifts to the party challenging the good faith of the settlement to show, by a preponderance of the evidence, the absence of good faith. *Johnson*, 203 Ill. 2d at 132.

¶ 64   In considering a request for a finding of good faith, the trial court is in the best position to decide what type of hearing is necessary to fully adjudicate the issue of good faith. *Johnson*, 203 Ill. 2d at 136. The trial court is not required to hold an evidentiary hearing prior to making a good-faith finding, but the court must have sufficient facts to fully evaluate the settlement and the allocation of the settlement proceeds. *Johnson*, 203 Ill. 2d at 136. Whether a settlement satisfies the good-faith requirement under the Contribution Act is a matter within the discretion of the trial court, based upon the court's consideration of the totality of the circumstances. *Guardianship of Babb*, 162 Ill. 2d at 162. The court's determination of the good-faith issue will not be reversed on appeal absent an abuse of discretion. *Guardianship of Babb*, 162 Ill. 2d at 162.

¶ 65   In this case, Cerro contends that the trial court's good-faith orders were premature because the settling parties failed to provide sufficient information to show the settlement satisfied the Contribution Act's policy concerning equitable apportionment of damages. Cerro claims that two aspects of the settlement are unknown: (1) the total amount that the Monsanto defendants will ultimately have to pay under the settlement and (2) how the settlement fund will be allocated among more than 11,000 individual plaintiffs and claimants. Cerro argues that without this information, a good-faith finding "defies" the Contribution Act's basic policies of ensuring the equitable apportionment of liability among codefendants and protecting the statutory right of setoff.

¶ 66   In response, the settling parties claim they presented a legally valid settlement agreement that was developed after the exchange of a massive amount of discovery and extensive mediation

efforts by all parties. They further claim that they met their initial burden of making a preliminary showing of good faith and that Cerro failed to satisfy its burden to show a lack of good faith by a preponderance of the evidence.

¶ 67                    A. The Existence of a Legally Valid Settlement Agreement

¶ 68    As previously noted, when determining whether a settlement agreement was made in good faith, the trial court must consider the totality of the circumstances surrounding the settlement. Thus, as a threshold matter, the trial court must determine whether the settlement is legally valid, *i.e.*, obtained with informed consent of the individual plaintiffs and without collusion or internal conflicts of interest. *Johnson*, 203 Ill. 2d at 132; *Knisley v. City of Jacksonville*, 147 Ill. App. 3d 116, 122, 497 N.E.2d 883, 887-88 (1986). In determining whether a settlement agreement is legally valid, the court may consider a number of factors, including the nature of the good-faith proceedings, the manner in which the settling parties obtained approval of the settlement, the terms of the settlement, and whether the settlement was obtained with the informed consent of the individual plaintiffs and without internal conflicts of interest. *Johnson*, 203 Ill. 2d at 134; *Guardianship of Babb*, 162 Ill. 2d at 161-63.

¶ 69                    *The Settlement Proceedings and the Manner of Approval*

¶ 70    In this case, the trial court was asked to consider an aggregate settlement of thousands of individual causes of action that were procedurally joined. During the hearings on the plaintiffs' motions for good-faith findings, counsel for the settling parties provided little information regarding the specific terms of the settlement. Instead, counsel characterized good-faith hearings as "routine" and relied heavily on the "the presumption that settlements are made in good faith." Counsel also relied on the fact that the settlement was supported by consideration, pointing out that the Monsanto defendants had deposited $10 million into a Trust Fund, and that the

29

individual plaintiffs and claimants had already executed the Release and received $600 in "Base Consideration." The settling parties offered no explanation as to how the parties arrived at the $600 "Base Consideration" payment or why all living plaintiffs were treated identically, despite their individual claims. There was no explanation as to why the families of the deceased plaintiffs were excluded from this payment. During the hearings, plaintiffs' counsel noted that the settlement was the product of an extensive mediation process, but his comments about the substance of the mediation were vague. For example, counsel noted that "hundreds of thousands of documents" were exchanged during mediation, and that "a lot of work" was done by "a number of attorneys," but he offered no information regarding the nature of the documents or the particular issues that were in dispute during the mediation process. Counsel did not provide the court with an assessment of the potential value of the plaintiffs' claims and damages, and he did not discuss, even in general terms, the liability of the respective defendants and available defenses. Counsel informed the court that the parties had exchanged reports of their respective experts, but he did not identify the experts or provide an overview of their opinions.

¶ 71    Based on the record, there is no indication that the trial court reviewed the Settlement Agreement prior to issuing its findings of good faith in either the 2009 cases or the 2014 cases. The record suggests that the Settlement Agreement was filed in the 2009 cases, only after the court directed that the Settlement Agreement, each Release, and the hearing transcript be filed, under seal, as part of the good-faith order. The report of proceedings of the good-faith hearing in the 2014 cases indicates that plaintiffs' counsel provided the trial court with a copy of the Settlement Agreement, without the corresponding exhibits, and there is no indication that the court reviewed any portion of the document prior to issuing a finding of good faith in those cases. Further, the Trust Agreement, which purportedly governs the distribution method for all

30

settlement funds, is not in the record, and it has never been produced, nor its terms discussed. There is no indication that the Trust Agreement was ever made available to the trial court during any of the proceedings in this case. Thus, we find no indication that the trial court reviewed, analyzed, or had access to the salient terms of the Trust Agreement at any time before making the good-faith findings.

¶ 72     It is noteworthy that in approving the settlement as to the 2009 cases, the trial court found that the "settlement concept" had been known to the parties for some time, and in approving the settlement as to the 2014 cases, the court found that the plaintiffs had received some compensation and there was a "framework" for additional compensation. A "concept" is defined as a thought or notion, a general or abstract idea, or a theoretical construct. Webster's Third New International Dictionary 469 (1986). "Framework" is defined as a skeletal or structural frame, a basic conceptual structure or scheme, or the limits or outlines of a particular set of circumstances. Webster's Third New International Dictionary 902 (1986). Thus, at the time of the good-faith hearings, the trial court seemingly recognized that the parties had only a conceptual framework for calculating the total value of the settlement and that substantive data, necessary to calculate the total value of the settlement or even a reasonable estimate of the value, was lacking. The trial court may have also recognized that the settling parties failed to present even a skeletal framework for the allocation of settlement dollars among the individual plaintiffs and claimants. Under these circumstances, the court had a duty to scrutinize the Settlement Agreement and to inquire about its terms. But, based upon this record, it did not do so. The failure of the settling parties to provide basic information to the trial court concerning the terms of the settlement and the method of allocation of the settlements funds is troubling and casts doubt on the legal validity of the Settlement Agreement.

31

¶ 74    After reviewing the Settlement Agreement and the Release, we have a number of questions and concerns surrounding informed consent and the adequacy of representation, which also casts doubt on the legal validity and good faith of the settlement. Initially, we note that this was an aggregate settlement of what is commonly referred to as a "mass tort" action. An aggregate settlement occurs when an attorney, while representing two or more clients in a joined action, settles the entire action on behalf of all clients, without negotiating an individual, fact-specific settlement for each client. Unlike class action settlements, there are no statutory provisions requiring the circuit court to evaluate and approve aggregate settlements of procedurally joined claims. *Knisley*, 147 Ill. App. 3d at 122. There are, however, rules of professional responsibility that govern the negotiation of aggregate settlements. *Knisley*, 147 Ill. App. 3d at 122.

¶ 75    The Illinois Rules of Professional Conduct of 2010 prescribe the professional responsibilities of lawyers who participate in the negotiation of aggregate settlements on behalf of their clients. Rule 1.8(g) of the Rules of Professional Conduct states:

> "A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims of or against the clients, *** unless each client gives informed consent, in a writing signed by the client. The lawyer's disclosure shall include the existence and nature of all the claims *** and of the participation of each person in the settlement." Ill. R. Prof'l Conduct (2010) R. 1.8(g) (eff. Jan. 1, 2010).

¶ 76    The comments accompanying subsection (g) of Rule 1.8 consider the potential conflicts of interests that may arise when a lawyer represents more than one client in a joinder action. Ill.

R. Prof'l Conduct (2010) R. 1.8 cmt. 13 (adopted July 1, 2009). Rule 1.8 is a corollary of Rule 1.2(a) and Rule 1.7 (Ill. R. Prof'l Conduct (2010) Rs. 1.2(a), 1.7 (eff. Jan. 1, 2010)) and provides that before any settlement offer is made or accepted on behalf of multiple clients, the lawyer must inform each client about all the material terms of the settlement, including what the other clients will receive or pay if the settlement is accepted. Ill. R. Prof'l Conduct (2010) R. 1.8 cmt. 13 (adopted July 1, 2009). Thus, an aggregate settlement requires the "informed consent" of each individual client.

¶ 77    "Informed consent" is defined as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." Ill. R. Prof'l Conduct (2010) R. 1.0(e) (eff. Jan. 1, 2010). The comments pertaining to the definition of "informed consent" state that the "communication necessary to obtain such consent will vary according to the Rule involved and the circumstances giving rise to the need to obtain informed consent." Ill. R. Prof'l Conduct (2010) R. 1.0 cmts. 6, 7 (amended Oct. 15, 2015). Accordingly, an individual litigant should not be bound by an aggregate settlement unless he has been informed of all of the material terms of the settlement and has specifically agreed to the terms of the settlement. Ill. R. Prof'l Conduct (2010) Rs. 1.0(e), 1.8(g) (eff. Jan. 1, 2010); *Knisley*, 147 Ill. App. 3d at 122.

¶ 78    Further, Rule 1.7 prohibits a lawyer from representing a client if the representation involves a "concurrent conflict of interest." Ill. R. Prof'l Conduct (2010) R. 1.7 (eff. Jan. 1, 2010). A concurrent conflict of interest exists if "the representation of one client will be directly adverse to another client," or there is a "significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client

33

or a third person or by a personal interest of the lawyer." Ill. R. Prof'l Conduct (2010) R. 1.7(a) (eff. Jan. 1, 2010). Rule 1.7(b) provides that a lawyer with a concurrent conflict of interest may, nonetheless, represent a client if (1) the lawyer reasonably believes that he or she will be able to provide competent and diligent representation to each affected client, (2) the representation is not prohibited by law, (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal, and (4) *each affected client gives informed consent*. Ill. R. Prof'l Conduct (2010) R. 1.7(b) (eff. Jan. 1, 2010). These Rules of Professional Conduct are for the protection of the individual litigants, and they should be strictly observed by counsel representing multiple claimants.

¶ 79    In a case such as this, where the trial court is presented with a motion to approve the settlement of thousands of individual claims that have been procedurally joined, the court has an obligation to insure that plaintiffs' counsel complied with Rule 1.7 and Rule 1.8(g) of the Rules of Professional Conduct. This is essential because if the settlement agreement is found legally invalid as a result of a lack of informed consent or due to the presence of internal conflicts of interest among individual plaintiffs or the plaintiffs and their attorneys, there can be no finding of "good faith" under the Contribution Act. *Johnson*, 203 Ill. 2d at 132. In this case, we do not know if the trial court considered whether this aggregate settlement, involving thousands of individual claims, complied with our Rules of Professional Conduct. The record is silent on this matter.

¶ 80    After reviewing the Settlement Agreement and the Release, however, we find a number of provisions that raise serious concerns about informed consent and potential conflicts of interest. In this case, the Settlement Agreement purported to dispose of 131 mass tort actions,

34

filed on behalf of 11,546 individual plaintiffs and claimants, each of whom had alleged individual personal injuries and property damages based on exposures to multiple toxins over a period of many years. Plaintiffs' counsel negotiated an aggregate settlement of all of these claims. Thus, the settlement was *not* based on individual, fact-specific negotiations of each person's claims and damages. Under the Settlement Agreement, each living plaintiff and claimant who signed a Release received the same "Base Consideration" payment of $600. In addition, each of the 600 plaintiffs who was randomly selected and who consented to provide a blood sample for analysis was paid an additional $500. Beyond these two guaranteed payments, any additional compensation that might be paid was conditional and dependent on the analysis of the randomly drawn blood samples. We are also concerned with the forfeiture provision, obscured within the fine print of the Release. Under this provision, a litigant is barred from any further participation in the settlement if that litigant was selected for the blood draw and refused, unless that litigant provided a documented medical reason or was otherwise excused by the Monsanto defendants.

¶ 81    Further, based on the conceptual framework of the settlement, there was a finite sum of money to be deposited in the additional settlement funds, and the amount of compensation allocated to one plaintiff, or group of plaintiffs, could adversely affect the amount of compensation available to other plaintiffs or groups of plaintiffs. Under this conceptual framework, there are serious questions with regard to how each individual client was informed that his or her case was negotiated in the aggregate, that the value of the individual compensation for one plaintiff may be directly affected by the number of individuals participating in the settlement, and that the individual compensation may be limited to only the $600 minimal "Base Consideration" payment, in exchange for releasing the Monsanto defendants from all liability for

35

known and unknown claims. Again, plaintiffs' counsel failed to assure the court that they had fully complied with the Rules of Professional Conduct prior to having each plaintiff execute a Release. The total lack of information casts a shadow on the legal validity of the settlement itself.

¶ 82    The absence of the Trust Agreement presents another serious concern. The Settlement Agreement provided that the plaintiffs' attorneys would serve as Trustees of the Trust Fund, and that the Trust Agreement would "outline in detail" the distribution method for all settlement funds. However, the Trust Agreement is not in the record, and the "detailed instructions" regarding allocation and distribution were not provided to the trial court in any of the proceedings. In the absence of the Trust Agreement, the trial court could not possibly know how the plaintiffs' attorneys, as Trustees, were going to allocate the additional funds, if any, among the individual plaintiffs and claimants whom they represented. As noted above, the conceptual framework of the Settlement Agreement presents potential conflicts of interest, not only between individual plaintiffs and their attorneys, but also among the plaintiffs themselves. And, there is no indication from the record that the trial court required the settling parties to produce the complete Trust Agreement. There is no indication that the court inquired into whether the allocation method, as described by the settling parties, presented current or potential conflicts of interest, and whether the settling plaintiffs consented to the conflicts, after being fully informed of them. There are many unanswered questions about whether the plaintiffs' attorneys provided adequate information so that each of their clients could make an informed decision about whether to accept the settlement. Some of the questions include whether the language of the Release was explained to each of the individual plaintiffs and claimants; whether the plaintiffs' attorneys explained the allocation process allegedly set forth in the Trust Agreement; whether the plaintiffs' attorneys, before asking each individual client to execute the Release, adequately

informed the individual client that certain claimants were receiving a base consideration amount of $600, while others were not included in that fund; whether the attorneys adequately advised the plaintiffs of the advantages and disadvantages of the method chosen for allocating the settlement funds amongst the additional settlement funds; and whether the attorneys adequately advised each of their clients that they could seek independent legal advice before agreeing to the aggregate settlement and the allocation method provided in the Trust Agreement. Finally, we note that the Settlement Agreement covered the 2009 cases and claims of individuals who had not yet filed lawsuits (the 2014 cases). Thus, it would be important to know whether these claimants were represented by counsel at the time the Settlement Agreement was executed, as plaintiffs' counsel could not settle claims for individuals whom they did not then represent.

¶ 83    As noted previously, the Release is also of great concern, especially with regard to the issue of informed consent and potential conflicts of interest. In this case, each participating plaintiff and claimant was required to execute a "Living Plaintiff" Release. Those who signed the document agreed to release the Monsanto defendants from liability for any and all past, present, or future potential claims, known and unknown. The opening paragraph of the Release provides that "the nature, structure, and terms" of the Settlement Agreement have been fully disclosed to the individual plaintiffs and claimants. However, a careful reading of the Release casts doubt on this representation. For example, the Release does not inform the individual participant that he or she is consenting to an aggregate settlement. The Release contains no provision informing the individual participant that his or her claims were negotiated as part of a global settlement or that there was no independent evaluation of his or her individual injuries and damages. The Release does not set forth the actual or projected sums for each of the additional settlement funds, and it does not outline the protocols for allocation of those funds among the individual settlement

37

participants. There is no provision informing the individual participant that the value of his or her claim would be conditioned on the results of blood drawn from 500 randomly selected settlement participants. The Release also contains the forfeiture provision that is not mentioned in the text of the Settlement Agreement. There is also a broad confidentiality provision that prohibits disclosure of the content of the Release and the Settlement Agreement to anyone other than plaintiffs' counsel.

¶ 84    During the good-faith hearings, plaintiffs' counsel made no representations regarding whether their clients had been informed, prior to executing Releases, that the settlement proceeds would be allocated differently among the plaintiffs, pursuant to protocols and instructions set forth in the Settlement Agreement and the Trust Agreement. Plaintiffs' counsel provided no argument or evidence to demonstrate that the individual plaintiffs had reviewed the Settlement Agreement or Trust Agreement at any time before executing the Release. There is no indication that the individual plaintiffs were informed that their attorneys were pursuing an aggregate settlement involving thousands of individual plaintiffs, or that plaintiffs' counsel would be acting as court-appointed "Trustees," instructing the Fund Administrator on the apportionment and distribution of the settlement funds among the various individual plaintiffs and claimants. There is no indication that each individual plaintiff agreed to waive any conflicts created by the joinder of the thousands of individual claimants. Further, based on the record, it appears there was no inquiry into the status of those individual clients who declined to participate in the settlement. Thus, there are unanswered questions regarding whether plaintiffs' counsel would continue to zealously represent the individual interests of those clients who had refused to participate in the settlement.

¶ 85    The form of the Release presents additional due process concerns. Unlike class action litigation, there are no statutes, rules, or applicable case law governing the format of this type of release and no requirement that a court approve the form and content of the release. In fact, but for the fact that the Monsanto defendants sought to extinguish potential claims under the Contribution Act, the settlement of these aggregated claims would not have required judicial approval. However, once the issue of the good-faith settlement was presented to the trial court for determination, it was incumbent upon the court to review the Release to insure that it complied with at least the basic notions of due process and fundamental fairness, as well as our rules regarding ethical conduct by counsel. The tiny font, coupled with the lack of space between paragraphs, made the Release almost impossible to read. The Release used the same capitalized terms found in the Settlement Agreement, although there is no indication that the person executing the Release was ever given a copy of, or access to, that agreement. There was no definition or explanation of the capitalized terms contained in the Release. Fundamental fairness required that the font be much more readable and that the terms be clearly defined.

¶ 86    Given the requirements set forth in Rules 1.7 and 1.8 of the Rules of Professional Conduct, it is troubling that plaintiffs' counsel failed to present sufficient information to demonstrate that all settlement terms had been adequately disclosed to their clients, and that any potential or current conflicts of interest had been discussed with, and waived by, each individual plaintiff-client prior to consenting to the settlement and executing the Release. Equally troubling, the circuit court made no inquiry regarding these fundamental requirements. The record suggests that the trial court placed its imprimatur on the Settlement Agreement without considering whether the individual plaintiffs and claimants had sufficient information about the settlement so

39

as to give informed consent and whether these individuals had received adequate representation. This inquiry is essential to the determination of whether there was a legally valid settlement.

¶ 87 There is also the matter of the attorney fees. In evaluating the adequacy of plaintiffs' counsel's disclosures to their clients, the trial court has the authority to evaluate contingent fee contracts to ensure that the lawyer is not collecting an unreasonable fee. See generally Ill. R. Prof'l Conduct (2010) R. 1.5 (eff. Jan. 1, 2010); *In re Doyle*, 144 Ill. 2d 451, 463, 581 N.E.2d 669, 674 (1991). In this case, the record contains an isolated reference to a contingent fee arrangement, but it does not provide any information regarding what fees plaintiffs' counsel would be paid as a result of this settlement. Plaintiffs' counsel did not discuss the fee arrangements during the good-faith hearings, and the information is not provided in the Release. The Release simply provides an acknowledgment that "prior to any distribution of settlement funds to me, expenses, costs and attorneys fees will be paid from the Trust to PLAINTIFFS' COUNSEL in the sum of a previously negotiated amount, which has been fully disclosed to me by PLAINTIFFS' COUNSEL." Court scrutiny of contingency fees and costs is particularly appropriate in this case, where the court is asked to decide whether a settlement is a good-faith settlement under the Contribution Act. An independent evaluation allows the court to consider whether a sufficient amount of the settlement proceeds is going to the plaintiffs, as opposed to their lawyers, and whether plaintiffs' counsel have inherent conflicts of interest in acting as the fiduciaries while collecting fees from the funds in the Trust.

¶ 88 In sum, it appears that the settling parties achieved a global compromise, with no structural assurance of fair and adequate representation and compensation for the diverse groups and individuals affected. There is scant information in the record upon which to properly evaluate the settlement and the method of apportionment. There are serious questions regarding

possible conflicts of interest and informed consent. The circumstances presented in this record cast doubt on the legal validity of the terms set forth in the Settlement Agreement. After reviewing this record, we find that the trial court lacked basic information from which to determine whether the parties presented a legally valid, aggregate settlement.

¶ 89       B. The Settlement Agreement and the Policies Underlying the Contribution Act

¶ 90    As noted above, the Contribution Act encourages the equitable apportionment of damages among joint tortfeasors when one tortfeasor pays more than its *pro rata* share of common liability. 740 ILCS 100/2(b) (West 2014); *Guardianship of Babb*, 162 Ill. 2d at 171. The Contribution Act also ensures the equitable apportionment of damages between settling and nonsettling tortfeasors by providing a right of setoff to the nonsettling tortfeasor. 740 ILCS 100/2(c) (West 2014); *Guardianship of Babb*, 162 Ill. 2d at 171. After reviewing the record, we find that the settling parties failed to satisfy their burden to show that the settlement was consistent with the equitable apportionment policy underlying the Contribution Act.

¶ 91    In considering whether a settlement has been made in good faith under the Contribution Act, "[t]he amount of [the] settlement must be viewed in relation to the probability of recovery, the defenses raised, and the settling party's potential legal liability." *Johnson*, 203 Ill. 2d at 137. Here, only the 2009 cases were on file and in the pleading stage at the time the proposed settlement was reached in November 2014. At the time of the good-faith hearings, the trial court had only the pleadings and written memoranda addressing the issue of good faith. There is no indication that the trial court reviewed the Settlement Agreement, or had any information justifying the allocation of the settlement funds among the plaintiffs, based upon their various theories of recovery. During the good-faith proceedings, the settling parties provided little additional information pertinent to the court's obligation to consider the settlement's impact on

41

equitable apportionment. The settling parties did not offer even an estimated amount of the final settlement or any basis for the settlement proposed. They did not outline their respective positions on any of the contested issues. They did not discuss the plaintiffs' likelihood of success or the defendants' relative exposure at trial. After four years of mediation, this basic information should have been readily available. Settlements do not occur in a vacuum. They occur in the context of disputed issues of liability and damages involving questions of law and fact. It is difficult to understand why basic information was not offered by the settling parties, or requested by the court, during the good-faith hearings. In this case, the record contains no basis or explanation for the settlement amounts, and the settling defendants' respective liabilities are unknown.

¶ 92    In addition, the settling parties failed to present any information establishing how the additional settlement fund proceeds, if any, will be allocated among the individual plaintiffs. This is significant because, under the Contribution Act, a good-faith settlement reduces the recovery on any claim against a nonsettling tortfeasor to the extent of the amount in the release or the sum actually paid. 740 ILCS 100/2(c) (West 2014). The right to a setoff reflects the public policy of ensuring that a nonsettling party will not be required to pay more than its *pro rata* share of shared liability. *Lard v. AM/FM Ohio, Inc.*, 387 Ill. App. 3d 915, 926, 901 N.E.2d 1006, 1018 (2009). A nonsettling defendant may claim as a setoff any amount that the plaintiff recovered in a prior settlement for damages arising from the same injury. *Lard*, 387 Ill. App. 3d at 926. Generally, the party who seeks the setoff has the burden of proving what portion of a prior settlement was allocated or is attributable to the claim for which he is liable. *Lard*, 387 Ill. App. 3d at 926. However, where a plaintiff fails to allocate the settlement, a nonsettling defendant may be relieved of that burden of proof. *Lard*, 387 Ill. App. 3d at 926.

¶ 93   In this case, the trial court had no information concerning how the settlement proceeds would be allocated among the plaintiffs and their claims. Further the trial court did not reserve the issue of the reasonableness of future allocations of any proceeds of the additional settlement funds pending completion of the blood analysis and the extrapolation process. Without some basic information regarding the allocation of the settlement funds, the trial court could not properly evaluate the settlement in light of the equitable apportionment policy underlying the Contribution Act.

¶ 94                                        III. CONCLUSION

¶ 95   After considering the totality of the circumstances surrounding this settlement, and the unique facts in this case, we find that the settling parties failed to meet their burden to make a preliminary showing that the settlement was legally valid and that the terms of the Settlement Agreement satisfied the "equitable apportionment policy" underlying the Contribution Act. In this case, the trial court should have examined the Settlement Agreement to determine whether it was obtained with informed consent, and without internal conflicts of interests, before considering whether the settling defendants were entitled to any relief under the Contribution Act. Such scrutiny was necessary to reduce the potential for inequity and abuses that may arise from an aggregate settlement. Therefore, the trial court's determination that the Settlement Agreement was entered in good faith was without foundation and, as such, was an abuse of discretion. For those reasons, we hereby vacate the trial court's good-faith orders and remand these cases for further proceedings consistent with this opinion.

¶ 96   On remand, the settling parties must make a preliminary showing that the Settlement Agreement is a legally valid agreement and that the settlement is consistent with the Contribution Act's policy favoring equitable apportionment of damages among joint tortfeasors. As noted

herein, the settling parties must provide some information concerning the contested issues related to liability, damages, and defenses; the projected total sum of the settlement; and the method of apportionment of settlement proceeds among the individual plaintiffs. In considering the motions for good-faith findings, the trial court must thoroughly review the Settlement Agreement and attached exhibits, the Trust Agreement, and the Release. In addition, the trial court must consider whether plaintiffs' counsel made full disclosures and provided adequate representation to each plaintiff and whether each individual plaintiff was fully informed of all material terms of the settlement. The court must also consider whether provisions in the Settlement Agreement and the Trust Agreement present conflicts of interest between counsel and plaintiffs and among plaintiffs and, if so, whether the plaintiffs were adequately informed of the conflicts and waived them. The court must also determine whether the plaintiffs were aware of the attorney fees and costs and how those fees and costs would be assessed and paid. In essence, the trial court must consider whether the individual plaintiffs received sufficient information to make an informed choice to settle their claims.

¶ 97    We note that when the trial court issued its order establishing the Qualified Settlement Fund, the court retained continuing jurisdiction over the Fund, the Trustees, and the Fund Administrator, and directed the Trustees, with the assistance of the Fund Administrator, to jointly prepare an accounting detailing all distributions from the Qualified Settlement Fund. On remand, the trial court may consider, in its discretion, whether to require the Fund Administrator to provide an accounting of funds distributed to date, whether to require periodic status reports, and whether plaintiffs' counsel, as the Trustees, should be required to supply a final accounting of the apportionment and distribution of all of the settlement funds for the court's review.

¶ 98    As is apparent from our discussion, there is much to be considered before the trial court

44

entertains any motion seeking relief under the Contribution Act. We recognize that this was a difficult case, and our comments should not be viewed as a rebuke of the trial court's action. Rather, as the trial court indicated, the nature of the case and the circumstances of the settlement were complex, and there was little precedent to provide guidance.

¶ 99    Additionally, our comments regarding the Settlement Agreement should not be construed as a condemnation of mass actions or aggregate settlements. The ability to join claimants and claims through procedural joinder is vital to the efficient use of judicial resources and the equitable settlement of mass torts. That said, counsel involved in joined actions must act with transparency so that nothing remains hidden from the court and their individual clients. We note that unlike our state courts, the federal courts have a structure for dealing with nonclass aggregate settlements. As noted herein, there are currently no Illinois statutes or rules, aside from the Rules of Professional Conduct, to guide and inform practitioners and the courts in addressing the unique issues presented by the aggregate settlement of mass torts. Mass tort actions are becoming more common, and perhaps, based on the concerns raised in this case, our supreme court will consider whether the implementation of additional rules regarding good-faith proceedings in mass tort cases might be of benefit to our trial courts and practitioners.

¶ 100   For the reasons stated, we vacate the findings and orders of good faith and remand this case to the circuit court for further proceedings consistent with this opinion.

¶ 101   Orders vacated; remanded.

APPENDIX

Nos. 09-L-295, 09-L-309, 09-L-334, 09-L-342, 09-L-404, 09-L-445, 09-L-494, 09-L-508, 09-L-527, 09-L-546, 09-L-558, 09-L-571, 09-L-657, 09-L-659, 09-L-665, 09-L-666, 09-L-669, 09-L-670, 09-L-671, 09-L-672, 14-L-353, 14-L-354, 14-L-357, 14-L-358, 14-L-359, 14-L-363, 14-L-364, 14-L-365, 14-L-366, 14-L-367, 14-L-368, 14-L-369, 14-L-370, 14-L-371, 14-L-372, 14-L-373, 14-L-374, 14-L-375, 14-L-376, 14-L-377, 14-L-378, 14-L-379, 14-L-380, 14-L-381, 14-L-382, 14-L-383, 14-L-384, 14-L-385, 14-L-386, 14-L-387, 14-L-388, 14-L-389, 14-L-390, 14-L-391, 14-L-392, 14-L-393, 14-L-394, 14-L-395, 14-L-396, 14-L-397, 14-L-398, 14-L-399, 14-L-400, 14-L-401, 14-L-402, 14-L-403, 14-L-404, 14-L-405, 14-L-406, 14-L-407, 14-L-408, 14-L-409, 14-L-410, 14-L-411, 14-L-412, 14-L-413, 14-L-414, 14-L-415, 14-L-416, 14-L-417, 14-L-418, 14-L-419, 14-L-420, 14-L-421, 14-L-422, 14-L-423, 14-L-424, 14-L-425, 14-L-426, 14-L-427, 14-L-428, 14-L-429, 14-L-430, 14-L-431, 14-L-432, 14-L-433, 14-L-434, 14-L-435, 14-L-436, 14-L-437, 14-L-438, 14-L-439, 14-L-440, 14-L-441, 14-L-442, 14-L-443, 14-L-444, 14-L-445, 14-L-446, 14-L-447, 14-L-448, 14-L-449, 14-L-450, 14-L-451, 14-L-452, 14-L-453, 14-L-455, 14-L-456, 14-L-458, 14-L-459, 14-L-460, 14-L-461, 14-L-462, 14-L-463, 14-L-464, 14-L-465, 14-L-466, 14-L-467, 14-L-468, 14-L-480, 14-L-567

2018 IL App (5th) 160161

NO. 5-16-0161

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| MARTHA CUSTER, *et al.*, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs-Appellees, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 09-L-295[***] |
| | ) | |
| CERRO FLOW PRODUCTS, INC.; PHARMACIA | ) | |
| CORPORATION, n/k/a Pharmacia LLC; | ) | |
| PHARMACIA & UPJOHN COMPANY LLC; | ) | |
| SOLUTIA, INC.; MONSANTO COMPANY; | ) | |
| PFIZER, INC.; MONSANTO AG PRODUCTS | ) | |
| LLC, n/k/a Monsanto Company; and EASTMAN | ) | |
| CHEMICAL COMPANY, | ) | |
| | ) | |
| Defendants | ) | Honorable |
| | ) | Vincent J. Lopinot, |
| (Cerro Flow Products, Inc., Defendant-Appellant; | ) | Judge, presiding |
| Pharmacia Corporation; Pharmacia & Upjohn | ) | |
| Company LLC; Solutia, Inc.; Monsanto Company; | ) | Honorable |
| Pfizer, Inc.; Monsanto Ag Products LLC; and | ) | Andrew J. Gleeson, |
| Eastman Chemical Company, Defendants-Appellees). | ) | Judge, presiding. |

_____

**Opinion Filed:**　　　　　April 18, 2018

_____

| | |
|---|---|
| **Justices:** | Honorable Judy L. Cates, J. |
| | Honorable Melissa A. Chapman, J., and |
| | Honorable James R. Moore, J., |
| | Concur |

_____

| | |
|---|---|
| **Attorneys for Appellant** | Stephen L. Agin, 909 W. Ohio Street, Unit 9, Chicago, IL 60642; Mark A. Kircher, Quarles & Brady, LLP, 411 E. Wisconsin Ave., Suite 2350, Milwaukee, WI 53202-4426; Lindsey T. Millman, E. King Poor IV, Anthony P. Steinike, Quarles & Brady, LLP, 300 N. LaSalle Street, Suite 4000, Chicago, IL 60654; Thomas R. Ysursa, Becker, Hoerner, Thompson & Ysursa, P.C., 5111 W. Main Street, Belleville, IL 62226 |

_____

| | |
|---|---|
| **Attorneys for Appellees** | Clyde L. Kuehn, 120 W. Main Street, Suite 122, Belleville, IL 62220 (attorney for Martha Custer, *et al.*); |
| | Bruce N. Cook, Bernard J. Ysursa, Cook, Ysursa, Bartholomew, Brauer & Shevlin, Ltd., 12 W. Lincoln Street, Belleville, IL 62220-2085; Charles R. Hobbs II, Patricia L. Silva, Lathrop & Gage, LLP, Pierre Laclede Center, 7701 Forsyth Blvd., Suite 500, Clayton, MO 63105; Joseph G. Nassif, Nassif Law Firm, 10701 Kingsbridge Estates Dr., Creve Coeur, MO 63141; Robert J. Sprague, Sprague & Urban, 26 E. Washington Street, Belleville, IL 62220 (attorneys for Eastman Chemical Co.; Monsanto AG Products LLC; Monsanto Co.; Pfizer, Inc.; Pharmacia & Upjohn Co. LLC; Pharmacia Corp.; Solutia, Inc.) |

_____

[***]A full listing of trial court case numbers is set forth in the appendix.